# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EDWARD DEANE, GEORGE WIHBEY, )
and JASON CUNNINGHAM IN HIS )
CAPACITY AS ATTORNEY-IN-FACT )
FOR WILLIAM CUNNINGHAM, for )
themselves and in the right and for the )
benefit of New Media Investors II-B, LLC )
and New Media II-B, LLC )
     )
         Plaintiffs, )
     )
         v. )         C.A. No. 2017-0346-LWW
     )
ROBERT A. MAGINN, JUNIOR, )
     )
         Defendant, )
     )
         and )
     )
NEW MEDIA INVESTORS II-C, LLC )
     )
         Nominal Defendant. )

## MEMORANDUM OPINION

Date Submitted: July 14, 2022
Date Decided: November 1, 2022

David H. Holloway, SHLANSKY LAW GROUP, LLP, Wilmington, Delaware; David J. Shlansky & Colin R. Hagan, SHLANSKY LAW GROUP, LLP, Chelsea, Massachusetts; *Counsel for Plaintiffs Edward Deane, George Wihbey, & Jason Cunningham*

Jody C. Barillare, Amy M. Dudash, & Kelsey A. Bomar, MORGAN LEWIS & BOCKIUS LLP, Wilmington, Delaware; Jane M. Manchisi, Karen Pieslak Pohlmann, & Laura Hughes McNally, MORGAN LEWIS & BOCKIUS LLP,

Philadelphia, Pennsylvania; Michael D. Blanchard of MORGAN LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Counsel for Defendant Robert A. Maginn, Jr.*

**WILL, Vice Chancellor**

This is the post-trial decision in a long-running dispute that seeks to hold defendant Robert A. Maginn, Jr. liable for breaches of fiduciary duty. Although the plaintiffs' legal theories have shifted during the five years that this case has been pending, their beliefs that Maginn acted to advantage himself at the expense of the members of New Media Investors II-B, LLC have remained constant. The plaintiffs' charges have ultimately been validated.

Maginn was the managing member of New Media II-B, a vehicle formed to facilitate investments in Jenzabar, Inc.—a private company that Maginn and his spouse founded. The plaintiffs are members of New Media II-B.

Due to a restructuring, New Media II-B held warrants giving it rights to purchase shares of Jenzabar common stock. The warrants were set to expire in June 2011. Because the value of Jenzabar common stock remained below the warrants' exercise price, there was a risk that the warrants would expire unexercised. A special committee of Jenzabar directors extended the expiration deadline, based on Maginn's expressed desire to find a solution for New Media II-B and its members.

At the same time, Jenzabar's special committee was working to streamline the company's bloated capital structure. If New Media II-B's members were able to invest directly in Jenzabar, further complications could arise. Maginn proposed a solution: an additional set of warrants could be issued for the benefit of New Media II-B but held by a new entity in which New Media II-B's members could then invest.

1

When the original warrants expired, the special committee approved the issuance of new warrants to what it believed was New Media II-B's successor entity. But the warrants were given to New Media Investors II-C, LLC—an entity that Maginn and his spouse had created in 2009 and solely owned.

Maginn borrowed money from New Media II-B to purchase the then-recently approved warrants for New Media II-C. But Maginn did not tell New Media II-B's members about the investment opportunity at that time. When these warrants neared expiration, Maginn used $3 million of personal funds to exercise them.

Six months later, Maginn sent a vague letter to New Media II-B's members to tell them that their investments would conclude upon the cashing of a "final check" and that they could learn about a "new" Jenzabar opportunity if they signed a non-disclosure agreement and release. Certain members, including the plaintiffs, neither cashed their checks nor signed the NDA.

Maginn maintained his silence about having purchased and exercised the new warrants for years. It was not until 2021, during discovery on a separate claim in this litigation, that the plaintiffs learned about Maginn's actions. Meanwhile, the shares of Jenzabar common stock that Maginn obtained through exercising the warrants have grown in value.

After trial, I find that Maginn breached his duty of loyalty when he usurped from New Media II-B the opportunity to obtain the new warrants. I award rescissory

2

damages to remedy that harm. Given the nature of New Media II-B's business and Maginn's ongoing involvement, I determine that a pro rata recovery to the members of New Media II-B (excluding Maginn) is appropriate. A subsequent decision will address the method for distributing damages to New Media II-B's members.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties,[1] proven by a preponderance of the evidence at trial,[2] or set forth in this court's March 2, 2022 summary judgment opinion (the "Summary Judgment Opinion").[3] Trial was conducted over three days during which four fact witnesses and two expert witnesses testified.[4]    The parties introduced 271 exhibits and three deposition transcripts.[5]    To the extent that any conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

### A.    Maginn, Jenzabar, and New Media

In 1998, defendant Robert A. Maginn, Jr. and his spouse founded Jenzabar, Inc., a private Delaware corporation that provides software and services for the

---

[1] Joint Pre-trial Stipulation and Proposed Order (Dkt. 266) ("PTO").

[2] Where facts are drawn from exhibits jointly submitted by the parties at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. Deposition transcripts are cited as "[Name] Dep." Trial testimony is cited as "[Name] Tr."

[3] *Deane v. Maginn*, 2022 WL 624415, at *2 (Del. Ch. Mar. 2, 2022) ("Summ. J. Op.").

[4] *See* Dkt. 299.

[5] *See* Dkt. 264.

3

education sector.[6]  Maginn served as Jenzabar's Chief Executive Officer from its inception until 2019.[7]

In 1999 and 2000, respectively, Maginn formed New Media Investors II, LLC ("New Media II") and New Media Investors II-B, LLC ("New Media II-B").  Both entities are Delaware limited liability companies formed to serve as "pass-the-hat" vehicles for investing in Jenzabar.[8]  New Media II-B is governed by a Limited Liability Company Agreement (the "LLC Agreement").[9]  Maginn served as the Managing Member of New Media II-B from 2000 until 2013.[10]

Plaintiffs Edward Deane, George Wihbey, and William Cunningham are members of New Media II-B.[11]  The plaintiffs were not members of New Media II.[12]

### B.     The Series A Junior Warrants

In 2004, following litigation between Jenzabar and an investor, Jenzabar recapitalized to satisfy certain repayment obligations.[13]  As part of that restructuring,

---

[6] Maginn Tr. 15; Summ. J. Op. at *2.

[7] Summ. J. Op. at *2.

[8] Maginn Tr. 15-17; Summ. J. Op. at *2.

[9] JX 1 ("LLC Agreement").

[10] Summ. J. Op. at *2.

[11] *Id.*

[12] *See* JX 72 at 13-16.

[13] Summ. J. Op. at *2.

4

New Media II-B received 4,647 shares of Series A Junior Preferred stock and Series A Junior warrants for 1,129,275 shares of Jenzabar common stock.[14]

Jenzabar was to redeem the Series A Junior Preferred shares for a total of $4.7 million over the next six years beginning on June 30, 2005, provided that certain financial metrics were achieved at the time of each redemption.[15] New Media II-B held 4,647 of the outstanding 8,700 shares (53%) of Series A Junior Preferred stock.[16] The Series A Junior warrants had an exercise price of $0.89 per share and a cashless exercise option, which would allow New Media II-B to exercise the warrants with foregone shares (the value of which would be determined in "good faith" by the board of directors of Jenzabar).[17]

New Media II held 2,451,466 Series A Junior warrants and New Media II-B held 1,129,275.[18] Other investors—including Bain & Company Inc., FSC Corp., and Simon Worldwide, Inc.—also held Series A Junior warrants.[19]

---

[14] PTO ¶ 4; Summ. J. Op. at *2; *see* JX 195; JX 10.

[15] JX 194 § V.A.4(c)(ii); JX 195 at 1 n.1; *see* JX 15; JX 16; JX 19; JX 22; JX 30; JX 35; JX 48.

[16] JX 196 at 1. New Media II held 2,172 shares (24.97%). *Id.* Various other investors held the other shares. *Id.*

[17] JX 7 Preamble § 1(b); Maginn Tr. 53-55.

[18] JX 167 at 18; JX 243; *see supra* note 14.

[19] JX 243. On or around October 21, 2011, these investors allowed their Series A Junior warrants to expire. JX 177 at 11; JX 59; JX 60; JX 66; *see* JX 72 at 8; JX 76 at 1.

5

The Series A Junior warrants were set to expire on June 30, 2011.[20] The final tranche of redemption payments for Series A Junior Preferred shares (amounting to just under $1 million for New Media II-B) was also due to be paid at this time.[21] This forthcoming redemption payment and the Series A Junior warrants were the only assets held by New Media II-B.[22]

According to Maginn, using the cash from the redemption payments to exercise the Series A Junior warrants was infeasible.[23] Similarly, the cashless exercise option seemed impossible. An April 26, 2011 409A valuation by KPMG concluded that the fair value of Jenzabar's common stock as of the end of 2010 was $0.66 per share—below the $0.89 per share strike price.[24]

As Maginn examined these options, he asked a special committee of Jenzabar's board of directors (the "Special Committee")[25] to grant a series of extensions to the June 30 expiration of the Series A Junior warrants.[26] The Special

---

[20] JX 7 § 1(a)(i).

[21] Maginn Tr. 52-53; *see* JX 48.

[22] Maginn Tr. 55-57, 81.

[23] *Id.*; *but see infra* at notes 178-94 and accompanying text (finding Maginn's characterization to be unsupported and self-serving).

[24] JX 26 at 2; Maginn Tr. 57-58.

[25] The Special Committee was established to simplify Jenzabar's capital structure and address any conflicts arising out of the fact that Maginn and his spouse Ling Chai Maginn were major stockholders and executives of Jenzabar. Maginn Tr. 59.

[26] *Id.* at 70-72.

Committee, composed of Dr. Joseph San Miguel and Dr. D. Quinn Mills, believed that Maginn requested the extensions so that he could seek out further opportunities for New Media II and New Media II-B members to invest in Jenzabar.[27] The Special Committee agreed to extend the expiration date to December 30, 2011.[28] It charged New Media II and New Media II-B $3,580.74 for this final extension to disincentivize Maginn from making further requests.[29]

On July 11, 2011, Jenzabar's Special Committee decided to reassess the feasibility of the cashless exercise option for the Series A Junior warrants, engaging Bulger Capital Partners to review KPMG's 2010 409A valuation.[30] In September, Bulger confirmed KPMG's view that the value of Jenzabar common stock was below the $0.89 strike price.[31] The Special Committee concluded that a cashless exercise of the Series A Junior warrants was not possible.[32]

---

[27] Mills Dep. 226.

[28] The expiration date was first extended from June 30, 2011 to September 30, 2011, and then extended to October 21, 2011. JX 54. Finally, the expiration date was extended to December 30, 2011. JX 67; JX 68 at 1-2.

[29] JX 67; JX 68 at 1-2; Mills Dep. 225-26. This extension to December 30 only applied to the Series A Junior warrants held by New Media II and New Media II-B. *See supra* note 19.

[30] JX 51 at 1.

[31] *Id.*; JX 56 at 5.

[32] JX 51 at 2. The board of directors of Jenzabar agreed with the Special Committee and delegated full power and authority to the Special Committee to proceed accordingly. JX 53 at 1; JX 55 at 1.

## C.    Maginn's Proposal

With the expiration of the Series A Junior warrants looming, Maginn assessed another approach.  It involved new warrants being issued to an investment vehicle that—like New Media II and New Media II-B—would serve as a "pass-the-hat" opportunity.  The members of New Media II and New Media II-B could then make "individual decisions" about whether to invest.[33]  Maginn considered whether such warrants could be given to an entity called New Media Investors II-C, LLC ("New Media II-C").[34]

On October 15, 2011, Maginn wrote to Jenzabar's General Counsel Jamison Barr to raise this proposal.[35]  Maginn suggested that the "complexity" surrounding the exercise of the Series A Junior warrants "could be solved by simply offering new shares of Jenzabar Common stock in the same number and at the same $0.89 strike price as the current warrants" to a "new" New Media entity.[36]  "If this were offered," Maginn explained, "the members of New Media [II and New Media II-B] that wished to purchase shares could do so as a new New Media IIC [investor]

---

[33] Maginn Tr. 56-57, 145, 168.

[34] *Id.* at 69, 89, 197 ("[I]f we could get a new deal at a strike price of whether it's 25 cents, 60 cents, whatever, that's better than the 89 cents, then we'd form the new entity, II-C, and offer it to everybody.").

[35] JX 61.

[36] *Id.*

establishing new capital accounts to reflect their ownership percentages while allowing the current warrants to expire unexercised."[37]

In December, Barr relayed to Maginn that he had spoken to San Miguel and the Special Committee's outside counsel about Maginn's proposal.[38]  Barr told Maginn that "the Special Committee believe[d] the better approach [w]as for the [Series A Junior] warrants to terminate," allowing "the right to buy stock" to be offered to "[New] Media members at a later date."[39]

The Special Committee was concerned with simplifying Jenzabar's capital structure, which had become "too complex and constituted an almost insurmountable barrier to further investment," mergers and acquisitions, or an initial public offering.[40]  In an email to San Miguel and outside counsel, Mills raised this problem in light of the possibility that the Series A Junior warrants would be exercised by individual New Media investors.  Because it "appear[ed]" that "the New Media group[] wishe[d] to exercise some or all of the [Series A] warrants," Mills cautioned that it would be "important to avoid replacing New Media as an ent[ity] which owns warrants in [Jenzabar] with instead a whole group of new

---

[37] *Id.*

[38] JX 75; *see* Mills Dep. 40-41; JX 69 at 1.

[39] JX 75.

[40] JX 70.

9

shareholders (New Media participants)."[41]   Similarly, Maginn told Barr and the Special Committee that a "failure" to organize the warrants under an LLC would "expose the company to massive litigation risk and violate the very charter of the Special Committee to simplify the capital structure."[42]

The Series A Junior warrants expired unexercised at the end of 2011.[43]

## D.    The II-C Warrant

On June 21, 2012, the Special Committee met "to consider the proposal received by Mr. Maginn and from [New Media II and New Media II-B] for a successor entity, New Media Investors II-C, . . . to purchase new equity in the Company."[44]   The Special Committee resolved to "accept the proposal" made by Maginn: that Jenzabar sell to "successor entity" New Media II-C "a warrant or warrants, in substantially the form of warrants issued on June 30, 2004, to purchase an aggregate of 6,500,000 shares of [Jenzabar] Common Stock."[45]   The exercise price would be equal to one share of Jenzabar common stock on June 30, 2012, as determined by an independent valuation.[46]

---

[41] *Id.* (Mills remarking that allowing the New Media participants to individually invest in Jenzabar could "further complicate" Jenzabar's capital structure); *see* Mills Dep. 206.

[42] JX 68 at 1.

[43] PTO ¶ 6.

[44] JX 87.

[45] *Id.*

[46] *Id.*

The Special Committee hoped to encourage the New Media members' continued investment in Jenzabar by approving Maginn's proposal.[47] Though the sale would technically be made to New Media II-C, the expectation was that New Media II-C would, in turn, offer the investment opportunity to the members of New Media II and New Media II-B.[48] Consistent with that goal, Barr explained to Jenzabar's outside counsel that the plan approved by the Special Committee would have Jenzabar "sell warrants to purchase up to 6.5 million shares to [New Media II and New Media II-B]."[49]

On June 29, 2012, the Special Committee issued warrants to purchase Jenzabar common stock (the "II-C Warrant") to New Media Investors II-C.[50] Although the Special Committee believed that the II-C Warrant was being issued to a new "successor entity" to New Media II and New Media II-B,[51] Maginn had formed New Media II-C in 2009.[52] New Media II-C was solely owned by Maginn and his spouse and it held no assets until it received the II-C Warrant.[53]

---

[47] Mills Dep. 202-03.

[48] Maginn Tr. 276-77.

[49] JX 137 (Barr email to Donald Board, copying Adolfo Garcia); Maginn Tr. 275-76 (explaining that Garcia was outside counsel to Jenzabar).

[50] JX 89; JX 91; *see* JX 87.

[51] JX 87; *see also* JX 61 (Maginn referring to New Media II-C as a "new" entity).

[52] Maginn Tr. 189-92.

[53] *Id.*

11

The II-C Warrant was issued for 6,500,000 shares of Jenzabar common stock.[54] Each individual warrant had "a[n exercise] price per share equal to the fair market value per share of Common Stock as determined by KPMG, LLP on an illiquid basis as of June 30, 2012."[55] By its terms, the II-C Warrant would expire within one year.[56]

Maginn used funds from New Media II and New Media II-B to pay the $65,000 purchase price for the II-C Warrant.[57] He testified that he did so because he intended to procure the II-C Warrant for the benefit of New Media II and New Media II-B members.[58] He eventually reimbursed $65,000 to New Media II and New Media II-B in December 2013.[59]

### E. The II-C Solicitation

On March 5, 2013, KPMG completed its valuation of Jenzabar common stock, setting the exercise price for the II-C Warrant at $0.47 per share.[60] New Media II

---

[54] JX 89 Preamble, § 1(a).

[55] *Id.*

[56] *Id.*

[57] Maginn Tr. 154.

[58] *Id.* at 270-71; *see* JX 107.

[59] Maginn Tr. 93, 104-05; JX 130. Maginn reimbursed the funds because he later realized that "in order to send their [New Media II and New Media II-B members'] final redemption payment . . . [h]e needed to [reimburse] the [$]65,000." Maginn Tr. 105.

[60] JX 99 at 3; JX 103.

and New Media II-B members had yet to learn that Maginn had procured the II-C Warrant.

In May 2013, Maginn began drafting a letter to New Media II and New Media II-B members to invite them to join New Media II-C and inform them about the investment opportunity provided by the II-C Warrant.[61] The initial draft explained that the Series A Junior warrants had expired unexercised and recounted the origins of the II-C Warrant.[62] It described the II-C Warrant, comparing the $0.47 per share strike price to the higher $0.89 per share strike price of the Series A Junior warrants.[63] The draft also expressed confidence in Jenzabar's future performance.[64]

In May, Maginn shared his initial draft with Barr, who revised the letter from two pages to five sentences.[65] The revised draft informed New Media II and New Media II-B members of "another Jenzabar opportunity" but required those interested to sign a non-disclosure agreement to learn about it.[66] At trial, Maginn testified that

---

[61] Maginn Tr. 95.

[62] JX 102 at 2-3.

[63] *Id.*; Maginn Tr. 95-97. This draft also attached the 2012 KPMG valuation that set the exercise price at $0.47 per share. JX 102.

[64] JX 102 at 2; Maginn Tr. 95-97.

[65] Maginn Tr. 97-99; *see* JX 102; JX 107; JX 108; JX 109.

[66] JX 108.

the revisions were intended to "protect Jenzabar's confidential information," though he could not identify what was confidential about the initial draft.[67]

Maginn, with Barr's assistance, finalized his correspondence to New Media II and New Media II-B members by May 2013.[68] But he did not send the letter (and waited until December to do so). Maginn testified that "pedestrian administrative" difficulties—such as locating the addresses of the 103 New Media II and 88 New Media II-B members, ordering new checks, and turnover among administrative personnel—caused delay.[69] Maginn further testified that he asked the Special Committee for an extension of the II-C Warrant, but the Special Committee refused.[70]

On June 29, 2013, Maginn paid $3,055,000 to exercise the II-C Warrant.[71] He paid the exercise price with funds from New Media SP, LLC, an investment vehicle owned by Maginn and his spouse to make personal investments.[72]

---

[67] Maginn Tr. 131-32, 242-44.

[68] *Id.* at 100; *see* JX 102; JX 107; JX 108; JX 109.

[69] Maginn Tr. 101-02, 181-84, 264-69; *see* JX 124; JX 130; JX 153.

[70] Maginn Tr. 101-02. There is no contemporaneous evidence of that request in the record.

[71] JX 110.

[72] Maginn Tr. 102-03, 152-53, 191; JX 121.

Six months later, on December 19, 2013, Maginn sent the correspondence he had drafted in May to New Media II and New Media II-B members.[73]  That letter (the "II-C Solicitation") read:

> Dear New Media Investor:
>
> I write to you on the conclusion of your New Media Investment either via New Media Investors II LLC or New Media Investor II-B LLC.  Enclosed please find your final check(s) for you [*sic*] investments in New Media together with a payment acknowledgement that indicates these checks complete your New Media II and/or New Media IIB investments.
>
> I would also like to inform you that New Media Investors has formed a new New Media entity, New Media Investors II[-]C, LLC, to invest in another Jenzabar opportunity.  As a New Media Investor, we would like to invite you to participate in this investment.  If you would like to participate in this investment, please sign and return the attached non-disclosure agreement, and we will contact you to provide you with information regarding this new opportunity.
>
> Sincerely,
>
> Robert A. Maginn, Junior
> Managing Member[74]

The II-C Warrant was not mentioned.[75]

---

[73] Maginn Tr. 135; JX 133.

[74] JX 133 at 1.

[75] *Id.*

The II-C Solicitation was accompanied by a distribution of redemption payments to New Media II-B members, which were described as their "final checks."[76] Maginn also enclosed a "Payment Acknowledgement and Release" agreement and a non-disclosure agreement (the "NDA").[77] The Payment Acknowledgement and Release provided that acceptance of the redemption payment would represent a repurchase of the members' equity and termination of their membership in New Media II-B.[78] It included a broad release of claims against New Media II-B, and Jenzabar, and their directors, officers, and managing members.[79] New Media II-B members were required to sign the NDA to receive further details about the "new opportunity."[80]

## F.    Reactions to the II-C Solicitation

Of the 88 members of New Media II-B, the three plaintiffs (and perhaps others) neither cashed their redemption checks nor signed the Payment

---

[76] *Id.*; Maginn Tr. 128.  This payment was for the final tranche of redemption payments on the Series A Junior Preferred stock (*see supra* note 21 and accompanying text) and a reimbursement of the $65,000 that Maginn used to purchase the II-C Warrant (*see supra* note 59 and accompanying text).

[77] JX 133 at 2-4.

[78] *Id.* at 2.

[79] *Id.* at 2.

[80] *Id.* at 1; Maginn Tr. 121.

16

Acknowledgement and Release.[81]  Jason Cunningham (acting as attorney-in-fact for his father, William Cunningham) testified that he did not sign the NDA because it required a release of the New Media II-B investment.[82]  From December 2013 to April 2014, 10 members of New Media II-B (and 14 members of New Media II, of which 10 were also members of New Media II-B) signed and returned NDAs.[83]

Little evidence exists concerning what (if any) information was conveyed to the members who signed NDAs.  Maginn testified that his communications with these members occurred orally by phone or in person.[84]  He further testified that he "d[idn't] know [and] may have" provided financial details about the II-C Warrant to those members he talked with.[85]

Charles Farkas, a member of New Media II, wrote to Maginn on January 2014 to say that he was "happy to grant the release and w[ould] return the non-disclosure

---

[81] *See* Maginn Tr. 238-42 ("[I]f you're asking whether there are other people who didn't cash their checks, the answer is yes.  We lost a few.  Of the 150 people, we couldn't find their addresses and apparently couldn't get them their checks, or if we did, they didn't cash them."); JX 191; JX 192.

[82] Cunningham Tr. 613-15.

[83] JX 197; *see* JX 72 at 13-16.

[84] Maginn Tr. 106-08, 122-24, 152; *see* JX 136.

[85] Maginn Tr. 123.

17

as [he] was interested in New Media II-C."[86]  Farkas signed an NDA but did not receive any information about New Media II-C or the II-C Warrant.[87]

Ultimately, none of the members of New Media II or New Media II-B became investors in New Media II-C.[88]

In December 2017, Maginn dissolved New Media II.[89]  In December 2020, Maginn sought to dissolve New Media II-B.[90]  On March 29, 2021, however, Deane filed a certificate of correction with the Delaware Secretary of State, providing that the certificate of cancellation filed in 2020 was "null and void."[91]  In April 2021, the plaintiffs purported to act by written consent to remove Maginn as Managing Member and declare themselves the managers of New Media II-B.[92]

---

[86] JX 138.

[87] Farkas Dep. 13, 16, 43. Farkas testified, however, that he was "eager to exit."  *Id.* at 23-25; *see* Maginn Tr. 123.

[88] Maginn Tr. 154.

[89] Pls.' Post-trial Br. (Dkt. 311) Ex. A.

[90] JX 172; Maginn Tr. 236-37.

[91] JX 179.

[92] JX 181.

### G. This Litigation

The plaintiffs first filed claims against Maginn in Delaware Superior Court on December 6, 2016.[93] On May 5, 2017, the plaintiffs filed the present action in this court.[94]

On June 15, 2021, after being granted leave, the plaintiffs filed the operative Amended Complaint.[95] The plaintiffs purport to bring their claims directly for themselves and for the benefit of any other New Media II-B members and derivatively on behalf of New Media II-B.

Count I of the Amended Complaint is for breach of fiduciary duty against Maginn.[96] Three distinct theories were advanced within that count. One concerned whether Maginn caused the Series A Junior warrants to go unexercised despite being "in the money" (the "Warrant Claim").[97] Another provided that Maginn caused various securities held by New Media II-B to "disappear" (the "Disappearing Securities Claim").[98] The third concerned whether Maginn "usurp[ed]" an

---

[93] Summ. J. Op. at *3.

[94] Verified Compl. (Dkt. 1).

[95] Am. Compl. (Dkt. 99).

[96] *Id.* ¶¶ 124-67; Summ. J. Op. at *4.

[97] Am. Compl. ¶ 124.

[98] *Id.*

investment opportunity—the II-C Warrant—belonging to New Media II-B (the "II-C Claim").[99]

Count II seeks a declaration that the plaintiffs are the sole members of New Media II-B, have been elected its managers, and that Maginn is no longer a manager or member of New Media II-B.[100]

Count III is an unjust enrichment claim.[101] It is pleaded "in the alternative, to the extent it is not entailed or cognizable in [the plaintiffs'] theories for breach of fiduciary duty."[102]

In the March 2, 2022 Summary Judgment Opinion, this court held that the Warrant Claim and Disappearing Securities Claim were time-barred and granted summary judgment with respect to those claims in Count I.[103] As to the II-C Claim and unjust enrichment claim, genuine issues of material fact remained as to their timeliness.[104] Summary judgment was denied with respect to the II-C Claim in Count I, Count II, and Count III.

---

[99] *Id.* ¶ 166.

[100] *Id.* ¶¶ 168-83.

[101] *Id.* ¶ 195.

[102] *Id.* ¶ 185.

[103] Summ. J. Op. at *5.

[104] *Id.* at *11.

A three-day trial was held beginning on March 28, 2022.[105]  After post-trial briefing, this matter was submitted for decision as of July 12.[106]

## II.    LEGAL ANALYSIS

The plaintiffs' claims at the time of trial were: the portion of Count I described as the II-C Claim; the declaratory judgment claim in Count II; and the unjust enrichment claim in Count III.  The proponent of a claim has the burden of proving each element of a cause of action by a preponderance of the evidence.[107]  Proof by a preponderance of the evidence means that something is more likely than not.[108]

I begin by discussing the plaintiffs' remaining breach of fiduciary duty claims in Count I.  The plaintiffs' post-trial briefs argued various forms of possible breaches by Maginn, including matters that had been resolved in the Summary Judgment Opinion.[109]  At post-trial argument, the plaintiffs clarified that they sought to prove

---

[105] *See* Dkt. 299.

[106] Dkt. 317.

[107] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018).

[108] *Id.*

[109] *See* Pls.' Post-trial Br. 15-33.  To the extent that the plaintiffs sought to prove a duty of care claim, it was disposed of in the Summary Judgment Opinion.  The plaintiffs' post-trial brief includes a section titled "Duty of Care," which sets out an argument that Maginn "made a conscious decision *not* to attempt to convince Jenzabar that the 2004 warrants were in-the-money and could be exercised cashlessly (or inquiring of the [New Media II-B members] whether they wanted to pay to exercise the [Series A Junior warrants])." *Id.* at 17 (emphasis in original).  That is a restatement of the Warrant Claim, which concerned whether "Maginn caused the [Series A Junior warrants] to go unexercised despite being 'in the money.'" Summ. J. Op. at *4.  The Warrant Claim was barred by the three-year statute of limitations.  *Id.* at *6-8.  The Summary Judgment Opinion held that "the alleged

21

at trial that Maginn breached his duty of loyalty by failing to disclose material information about the II-C Warrant and by usurping a business opportunity belonging to New Media II-B.[110]

I first consider whether those claims are time-barred. I find that the disclosure claim is time-barred but the usurpation claim is not. Turning to the merits of the latter, I find that the plaintiffs proved that Maginn breached his duty of loyalty. I then address the appropriate remedy for Maginn's breach.

### A. Whether the Plaintiffs' Breach of Fiduciary Duty Claims Are Time-Barred

Statutes of limitations apply by analogy to equitable claims that—like the II-C Claim—seek legal relief.[111] "Absent tolling, the limitations period 'begins to run from the time of the [allegedly] wrongful act, without regard for whether the plaintiff

---

wrongful act [underlying the Warrant Claim] transpired on October 2, 2011, when Maginn allowed the expiration [of the Series A Junior warrants] to occur" and that Cunningham "was on inquiry notice [of the alleged wrongful act] by July 2012." *Id.* at *6, *8 ("An email from Cunningham to Maginn on July 23, 2012 made clear that Cunningham had 'spoken to [Barr] numerous times about the expiration of [the plaintiffs'] warrants' on behalf of a 'consortium of individual investors' before that date.").

[110] Post-trial Tr. (Dkt. 321) 9-12.

[111] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 981 (Del. Ch. 2016) (explaining that great weight is given to the analogous statute of limitations when considering equitable claims).

became aware of the wrongdoing at that time.'"[112] An analogous three-year statute of limitations applies to the plaintiffs' breach of fiduciary duty claims.[113]

The underlying wrongful acts occurred as early as June 2012 (when the II-C Warrant was issued to New Media II-C) and as late as December 2013 (when the II-C Solicitation was sent). The II-C Claim was not, however, pleaded until June 2021.[114] Barring tolling, it is untimely.

The limitations period can be tolled "until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury."[115] The plaintiffs rely on three doctrines to support tolling: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. "Each of these doctrines permits tolling of the limitations period where the facts underlying a claim are so hidden that a reasonable plaintiff could not timely discover them."[116]

---

[112] *Firemen's Ret. Sys. St. Louis v. Sorenson*, 2021 WL 4593777, at *8 (Del. Ch. Oct. 5, 2021) (quoting *Kraft*, 145 A.3d at 989); *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) ("This Court has repeatedly held that a cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."); *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 733 (Del. 2020) ("Outside these [tolling] exceptions, the statute of limitations continues to run even if the claimant is unaware of the facts supporting a cause of action.").

[113] *See Wal-Mart*, 860 A.2d at 319 (applying a three-year statute of limitations by analogy to fiduciary duty and unjust enrichment claims under 10 *Del. C.* § 8106).

[114] Am. Compl. ¶¶ 165-66.

[115] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998).

[116] *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) (quoting *Dean Witter*, 1998 WL 442456, at *5).

Under the doctrine of inherently unknowable injuries:

> [T]he running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.[117]

"Fraudulent concealment requires an affirmative act of concealment or 'actual artifice' by a defendant that prevents a plaintiff from gaining knowledge of the facts."[118] "[T]he doctrine of equitable tolling stops the statute [of limitations] from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary. No evidence of actual concealment is necessary in such case."[119]

If the limitations period is tolled under any of these doctrines, it is tolled only until the plaintiffs discovered (or could have discovered through reasonable diligence) their injuries.[120] That is, the limitations period begins when a plaintiff is put on inquiry notice, meaning that the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the wrong."[121]

---

[117] *Dean Witter*, 1998 WL 442456, at *5.

[118] *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

[119] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[120] *Dean Witter*, 1998 WL 442456, at *6.

[121] *In re Tyson Foods, Inc*., 919 A.2d 563, 585 (Del. Ch. 2007) ("Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no

Maginn argues that the plaintiffs have been on inquiry notice of the II-C Claim since receiving the II-C Solicitation in December 2013.[122] The plaintiffs, for their part, assert that they lacked inquiry notice of the II-C Claim until March 2021 when they learned about the II-C Warrant from Maginn's deposition testimony.[123] A determination of when the plaintiffs were put on inquiry notice of the II-C Claim must be considered under each of its two components: disclosure and usurpation of a business opportunity.

### 1. The Disclosure Theory

The plaintiffs assert that Maginn breached his fiduciary duties to the members of New Media II-B by failing to provide material information in the II-C Solicitation.[124] Setting aside the aspects of this argument that bear on their business opportunity claim, the plaintiffs assert that the II-C Solicitation was materially misleading because it "reflect[ed] an intention to discourage inquiry."[125] In other words, the II-C Solicitation failed to provide New Media II-B's members with

---

sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.").

[122] Def.'s Post-trial Br. (Dkt. 314) 23-25.

[123] Pls.' Post-trial Br. 41; *see* Summ. J. Op. at *11.

[124] Unlike the plaintiffs' business opportunity claim, this disclosure claim is cognizable as a direct claim. *See Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *3 (Del. Ch. 2009).

[125] Pls.' Post-trial Br. 27.

enough information to understand why their investment had ended or to determine whether to pursue the "new" Jenzabar investment.

This direct disclosure claim is time-barred. The brevity of the II-C Solicitation was apparent by its very terms. The packaging of members' "final checks" with a release and NDA was also obvious. Had the plaintiffs felt that the II-C Solicitation was deficient after receiving it, they were not prevented from promptly seeking relief. But the plaintiffs waited until years after the analogous three-year statute of limitations had lapsed to advance this theory.

### 2. The Business Opportunity Theory

The doctrine of equitable tolling applies to the plaintiffs' business opportunity claim.[126] That claim turns on whether Maginn took the opportunity presented by the II-C Warrant for himself rather than offering it to New Media II-B. The plaintiffs were entitled to rely on "the competence and good faith"[127] of Maginn, who was tasked with protecting their interests as New Media II-B's Managing Member. But Maginn failed to disclose to New Media II-B or its members that a new warrant,

---

[126] *See generally Bocock v. Innovate Corp.*, 2022 WL 15800273, at \*14 (Del. Ch. Oct. 28, 2022) (applying the doctrine of equitable tolling to a usurpation of corporate opportunity claim at the pleadings stage). Because equitable tolling applies, it is unnecessary to address whether the doctrine of inherently unknowable injury or fraudulent concealment apply.

[127] *Tyson*, 919 A.2d at 590-91.

26

intended to provide redress for the expiration of the Series A Junior warrants, had been issued to New Media II-C—an entity he owned and controlled.

The II-C Solicitation did not put the plaintiffs on inquiry notice of their business opportunity claim.[128]  As the Summary Judgment Opinion described, "[n]othing in [the II-C Solicitation] indicates either that the [Jenzabar] opportunity [referenced therein] was created specifically for [plaintiffs'] benefit or that it was (allegedly) redirected for Maginn's exclusive benefit, both of which are central to the II-C Claim."[129]  The II-C Solicitation stated only that "New Media Investors ha[d] formed a new New Media entity, New Media Investors II[-]C, LLC, to invest in another Jenzabar opportunity."[130]  A reasonable person would not understand that "another Jenzabar opportunity" was intended for the benefit of New Media II-B and its members, much less that Maginn had himself exercised the II-C Warrant six months earlier.

---

[128] *See Lehman Bros. Hldgs., Inc. v. Kee*, 268 A.3d 178, 186 (Del. 2021) ("Where the discovery rule applies, the statute of limitations is tolled until the plaintiff discovers the facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." (quoting *Wal-Mart*, 860 A.2d at 319)).

[129] Summ. J. Op. at *11.

[130] JX 133 at 1.

The evidence adduced at trial confirms that the plaintiffs lacked notice of their business opportunity claim until just before it was pleaded.[131] Deane testified that he did not learn about the II-C Warrant until a deposition in 2021.[132] Jason Cunningham likewise testified that he (and his father) did not learn of the II-C Warrant until 2021.[133] Cunningham explained that "the [II-C Solicitation] made it so that it really was a new opportunity versus the property of . . . II-B."[134] Cunningham and his father interpreted the II-C Solicitation to bear on whether William was giving up rights in the Series A Junior warrants by cashing his check and signing the Payment and Acknowledgement Release.[135] Similarly, Wihbey testified that he only learned of the II-C Warrant "[l]ast year or so."[136]

---

[131] Insofar as Maginn argues the plaintiffs failed to request information, the outcome does not change. Again, the II-C Solicitation would not have given the plaintiffs much reason to inquire further. Nor were the plaintiffs given a clear opportunity to ask for information. The NDA was packaged with the Payment Acknowledgement and Release, which led some members (such as Cunningham) to ascribe a connection between receiving information and cancelling their investment. *See* Cunningham Tr. 585. There is also reason to doubt whether the plaintiffs would have been given information if they asked. Certain members who returned their NDAs did not receive information about the II-C Warrant. *See supra* note 87 and accompanying text; *see also* Cunningham Tr. 611 (Cunningham asked to sign an NDA but never received one.).

[132] Deane Tr. 549-50.

[133] Cunningham Tr. 585.

[134] *Id.* at 621.

[135] *Id.*

[136] Wihbey Tr. 627-28.

Maginn also argues that laches bar this claim. The "touchstone of the laches inquiry is whether an inexcusable delay leads to an adverse change in the condition or relations of the property or parties."[137] In Maginn's view, he is prejudiced because the plaintiffs' delay benefitted them due to the increase in value of Jenzabar common shares.[138] But the plaintiffs could not have used time as an option to their advantage; they lacked knowledge about the II-C Warrant in the first place.

Accordingly, the plaintiffs' business opportunity claim is timely.

## B. Whether the Duty of Loyalty Claim is Direct or Derivative

The plaintiffs' remaining breach of fiduciary duty claim is for usurpation of a business opportunity. "A claim that a director or officer improperly usurped a corporate opportunity belonging to the corporation is a derivative claim."[139]

Maginn recognizes as much.[140] He argues that, nonetheless, the II-C Claim should be treated as a direct claim, consistent with the approach taken in *In re Cencom Cable Income Partners, L.P. Litigation*.[141] In that case, the court was asked

---

[137] *Whittington v. Dragon Grp. LLC*, 2009 WL 1743640, at *12 (Del. Ch. June 11, 2009).

[138] *See Quill v. Malizia*, 2005 WL 578975, at *14 (Del. Ch. Mar. 4, 2005) (discussing the prejudice suffered by a party where the counterparty "used time as an option . . . reserving to himself the right to leisurely present a claim of ownership" with no downside risk).

[139] *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1189 (Del. Ch. 2000).

[140] Def.'s Post-trial Br. 36.

[141] 2000 WL 130629 (Del. Ch. Jan. 27, 2000); *see* Def.'s Pre-trial Br. (Dkt. 277) 43-46; Def.'s Post-trial Br. 36-37.

to decide whether claims brought by limited partner plaintiffs regarding the liquidation of the partnership were direct or derivative.[142] The court acknowledged that the claims were derivative because the alleged injury devalued the partnership's assets but considered the claims direct due to the unique circumstances of that case.[143] Specifically, the court explained that "the partnership's business [was] complete, the liquidation sale [was] over, and the only two parties to the partnership [we]re now clearly adversaries."[144] The recovery could, as a practical matter, only flow to the limited partner plaintiffs.

Similarly, in *Anglo American Security Fund, L.P. v. S.R. Global International Fund, L.P.*, the court allowed claims typically regarded as derivative to be brought directly in the context of a limited partnership.[145] The limited partnership in that case was structured such that "whenever the value of the [partnership wa]s reduced, the injury accrue[d] irrevocably and almost immediately to the current partners but w[ould] not harm those who later become partners."[146] The approach in *Anglo American* was grounded in the fact that "recovery would flow to partners that had

---

[142] *Cencom*, 2000 WL 130629, at *4.

[143] *Id.* at *4-6.

[144] *Id.* at *4.

[145] 829 A.2d 143, 151 (Del. Ch. 2003).

[146] *Id.* at 152.

joined the fund after the harm occurred, and would provide no relief to the former partners who were actually harmed by the alleged conduct."[147]

The facts here are markedly different. New Media II-B is not a partnership.[148] It has not been dissolved,[149] and remains a "distinct legal creature for purposes of this litigation."[150] It has not gained or lost investors since the litigation commenced. Certain of the concerns animating *Cencom* and *Anglo American* may be relevant for the distribution of damages (addressed below) but do not support disregarding the derivative nature of the plaintiffs' claim entirely.

Application of the *Tooley* test further underscores that the plaintiffs' claim is derivative.[151] Two questions form that test: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the

---

[147] *Metro. Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *11 (Del. Ch. Dec. 20, 2012) (citation and emphasis omitted).

[148] *See Akins v. Cobb*, 2001 WL 1360038, at *6 n.18 (Del. Ch. Nov. 1, 2001) (declining to expand the "fact-intensive [*Cencom*] decision . . . into the corporate context"); *see also Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004) ("*Cencom*, which involved a dissolving partnership, is limited to its own unique set of facts.").

[149] *See supra* notes 90-92 and accompanying text. *See Metro. Life Ins.*, 2012 WL 6632681, at *11 (declining to extend *Cencom* to an entity that was winding up but not dissolved). New Media II, by contrast, was dissolved. Pls.' Post-trial Br. Ex. A. The plaintiffs are not proceeding on behalf of New Media II.

[150] *Agostino*, 845 A.2d at 1125.

[151] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

31

benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[152]

A claim is derivative where the "nature of the alleged injury is such that it falls directly on the LLC as a whole and only secondarily on an individual member as a function of and in proportion to his pro rata investment in the LLC."[153] The plaintiffs' duty of loyalty claim centers on the issuance of the II-C Warrant to New Media II-C instead of New Media II-B. The II-C Warrant was never intended to issue to New Media II-B members individually but to an entity.[154] Any direct harm to the individual members of New Media II-B would have come later, when making individual investment decisions and from an absence of distributions.

The remedy would also accrue to New Media II-B in the first instance.[155] Maginn asserts that damages would need to be determined on an individual basis because some members were not interested in, and would not have invested in, the

---

[152] *Id.*

[153] *Kelly v. Blum*, 2010 WL 629850, at *9 n.63 (Del. Ch. Feb. 24, 2010); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 819 (Del. Ch. 2005) ("The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC."), *aff'd*, 906 A.2d 766 (Del. 2006); *Anglo Am.*, 829 A.2d at 150 ("If the injury is one that affects all partners proportionally to their pro rata interests in the corporation, the claim is derivative.").

[154] *See supra* notes 33-42 and accompanying text; *see also* JX 87 (approving Maginn's proposal "for a successor entity, New Media Investors II-C . . . to purchase new equity in [Jenzabar]").

[155] *See Tooley*, 845 A.2d at 1033.

32

II-C Warrant.[156]  Even so, the members are not entitled to a personal recovery.  They would "recover *pro rata* in proportion with their ownership of the [LLC]."[157]

##### C.    Whether Maginn Breached His Duty of Loyalty

The plaintiffs contend that Maginn breached his fiduciary duty of loyalty by obtaining the II-C Warrant for himself rather than for New Media II-B.  The elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty owed by the defendant to the plaintiff and (2) a breach of that duty.[158]  I consider each element in turn.

---

[156] Def.'s Post-trial Br. 36-37; Def.'s Pre-trial Br. 47-49.  Some members of New Media II-B, such as Farkas, appear to have been uninterested in the II-C Warrant and desired to exit their investment completely.  Other members signed the Payment Acknowledgement and Release, relinquishing their interests in New Media II-B.

[157] *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *7 (Del. Ch. June 23, 2015) ("If all of the stockholders (or in this case, LLC members) 'are harmed and would recover *pro rata* in proportion with their ownership of the [company] solely because they are [interest holders], then the claim is derivative in nature.'"); *see El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) ("Were [plaintiff] to recover directly for the alleged decrease in the value of the [entity's] assets, the damages would be proportionate to his ownership interest.  The necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative."); *Cencom*, 2000 WL 130629, at *3 ("[A] derivative claim states injury against and seeks relief for a business association as a whole.  Any relief flowing to the association's participants as individuals only comes to them indirectly, by way of their pro-rata stake in the association."); *see also infra* notes 327-32 and accompanying text (discussing pro rata distribution of damages).

[158] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del.).

### 1. Maginn's Fiduciary Duties

As Managing Member, Maginn owed fiduciary duties to New Media II-B and its members. "By default, limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation."[159] In the analogous corporate context, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[160] The duty of loyalty includes a "subsidiary element" requiring that the fiduciary act in good faith.[161]

The LLC Agreement vested the Managing Member with a manager's traditional fiduciary duties. It provided that the Managing Member had:

> full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as [the Managing Member] deem[ed] necessary or appropriate to accomplish the purpose of the Company as set forth [t]herein.[162]

---

[159] *Mehra v. Teller*, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (citing 6 *Del. C.* § 18-1104).

[160] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[161] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[162] LLC Agreement § 11(ii).

It also stated that the Managing Member had:

> the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any acts and all acts deemed by the Managing Member to be necessary or appropriate to effectuate the business, purposes and objective of the Company, at the expense of the Company.[163]

The LLC Agreement did not alter the Managing Member's default fiduciary duties.[164]

## 2. Maginn's Breach of His Duty of Loyalty

The plaintiffs sought to prove that Maginn breached his duty of loyalty when he diverted the II-C Warrant to New Media II-C, usurping an opportunity meant for New Media II-B.[165] The corporate (or business) opportunity doctrine is "a subspecies of the fiduciary duty of loyalty."[166] As such, the determination of whether a corporate opportunity occurred should not be "decided on narrow or

---

[163] *Id.* § 12.

[164] *See id.*; *see also Mehra*, 2021 WL 300352, at *28 ("Although Delaware law permits a limited liability company to eliminate fiduciary duties in the governing agreement, the LLC Agreement does not do so." (citing 6 *Del. C.* § 18-1101(e))).

[165] Pls.' Post-trial Br. 18-23. The opportunity would also have been intended for New Media II but the plaintiffs do not (and cannot) seek recovery for that now-canceled entity.

[166] *Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *14 (Del. Ch. Feb. 25, 2019) (quoting Eric Talley, *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine*, 108 Yale L.J. 277, 279 (1998)); *see also Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154-55 (Del. 1996) (explaining that the corporate opportunity doctrine is "one species of the broad fiduciary duties assumed by a corporate director or officer").

technical grounds, but upon broad considerations of corporate duty and loyalty."[167]

This "duty has been consistently defined as 'broad and encompassing,' demanding of a [fiduciary] 'the most scrupulous observance.'"[168]

The "classic statement of the doctrine" was set out in *Guth v. Loft, Inc.*:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.[169]

More recently, the Delaware Supreme Court in *Broz v. Cellular Information Systems, Inc.* described the doctrine as follows:

> [A] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[170]

---

[167] *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939).

[168] *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) (quoting *Cede*, 634 A.2d at 361).

[169] *Guth*, 5 A.2d at 510-11.

[170] *Broz*, 673 A.2d at 154-55.

"No one factor is dispositive and all factors must be taken into account insofar as they are applicable."[171] "Rulings on business opportunity issues are therefore fact-intensive, and '[h]ard and fast rules are not easily crafted.'"[172] The central inquiry is "whether or not the [fiduciary] has appropriated something for himself that, in all fairness, should belong to his [company]."[173]

### a. Financial Ability

The first *Broz* factor looks to whether the company had the financial ability to take on the opportunity. In analyzing this element, the court may consider "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard."[174] The Court of Chancery has applied the "insolvency-in-fact" test, which looks to whether the entity "is practically defunct."[175] It has also considered "whether the [entity] is in a position to commit capital, notwithstanding the fact that

---

[171] *Id.* at 155.

[172] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 852 (Del. Ch. 2022) (quoting *Broz*, 637 A.2d at 155).

[173] *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del. 1966).

[174] *Pers. Touch*, 2019 WL 937180, at *14 (quoting *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 n.2 (Del. 1995)).

[175] *Gen. Video Corp. v. Kertesz*, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (quoting *Sterianou ex rel. Stephanis v. Yiannatsis*, 1993 WL 437487, at *4 (Del. Ch. Oct. 4, 1993)).

the [entity] is actually solvent."[176] Regardless, "consistent with the discretion afforded the court to determine financial ability, such a determination is a fact-intensive inquiry that generally requires a developed record."[177]

There is no question that New Media II-B had the ability to purchase the II-C Warrant for $65,000 on June 29, 2012, when the II-C Warrant was issued to New Media II-C.[178] Indeed, New Media II-B paid slightly less than half of the purchase price.[179]

Maginn subsequently exercised the II-C Warrant for $3,055,000.[180] Maginn testified that New Media II-B had $920,000 in its bank accounts (from the Series A Junior Preferred redemption payments) in or around June 2012.[181] Bank account statements showed that New Media II-B still had these funds in April 2013.[182]

---

[176] *In re Riverstone Nat., Inc. S'holder Litig.*, 2016 WL 4045411, at *9 (Del. Ch. July 28, 2016).

[177] *Id.*

[178] *See Broz*, 673 A.2d at 155.

[179] New Media II paid $33,813.14 and New Media II-B paid $31,186.86. JX 130 at 2.

[180] JX 110.

[181] Maginn Tr. 232. New Media II had $500,000. *Id.* at 232.

[182] JX 101.

Given the anticipated involvement of New Media II,[183] it seems unlikely that New Media II-B would have paid the full $3 million to exercise the II-C Warrant.[184] Additionally, the II-C Warrant had a cashless exercise option, meaning further cash investments (beyond the $65,000 purchase) may have been unnecessary.[185] The plaintiffs testified that had the opportunity been presented, they would have invested further in New Media II-B to fund the exercise.[186]

Maginn does not dispute that New Media II-B had the means and ability to exercise the warrants. He argues, instead, that New Media II-B's funds were unavailable because they were "promised" for distribution to the members of New Media II-B and could not be used to purchase (or exercise) the II-C Warrant.[187]

---

[183] The II-C Warrant was intended to be a substitute to the Series A Junior warrants held by both New Media II and New Media II-B. *See supra* notes 33-42 and accompanying text.

[184] New Media II held 2,451,466 Series A Junior warrants. JX 167 at 18; JX 243. New Media II-B held 1,129,275 Series A Junior warrants. JX 7.

[185] JX 89 § 1(b).

[186] Deane Tr. 550-551. The plaintiffs had substantial personal assets sufficient to exercise the II-C Warrant. *See* JX 198; JX 199; JX 201; JX 202; JX 185; JX 187. The defendant filed a Motion in Limine to Exclude Evidence and Argument Regarding Plaintiffs' Ability to Exercise the II-C Warrant. Dkt. 241. The defendant withdrew that motion before trial but reserved his rights to press it pending completion of the plaintiffs' document production. Dkt. 263. I assume that motion is moot. Insofar as it is not, the motion is denied. Maginn had the opportunity at trial to cross-examine the plaintiffs on their personal abilities to exercise the II-C Warrant.

[187] Def.'s Post-trial Br. 39-40.

39

New Media II-B had a practice of making distributions to its members. For example, previous Series A Junior Preferred redemption payments from Jenzabar had been distributed to New Media II-B members.[188] But there is no evidence that New Media II-B's funds were "promised" or committed for the sole purpose of distributions and thus unavailable for any other use. The LLC Agreement did not mandate distributions but left the decision of whether to make distributions to Maginn's sole discretion.[189] Further, the 2004 solicitation asking New Media II-B members to approve the Jenzabar restructuring expressly warned members that "there can be no assurances that . . . any such cash payments [for the redemptions] will be made."[190]

Maginn's delay in distributing the final Series A Junior Preferred redemptions to New Media II-B members further indicates that New Media II-B's funds were not committed as distributions. On September 9, 2011, Jenzabar paid New Media II-B

---

[188] *See* JX 13 at 2; JX 30 at 2; *see* Maginn Tr. 183.

[189] LLC Agreement § 15. Of course, as the manager of New Media II-B, Maginn had sole discretion over whether to liquidate the Jenzabar investments held by New Media II-B and to distribute these proceeds to members. *Id.* §§ 12, 15. But, his discretion was circumscribed by the fiduciary duty of loyalty.

[190] JX 5 at 2; *see also* JX 12 at 1 ("[T]he Company will redeem the remaining $4,700,000 . . . , provided that the Company meets certain financial metrics at the time of each redemption, *the achievement of which is not guaranteed nor reasonably assured at this time*. On the other hand, the remaining shares held by New Media II and New Media II-B may be redeemed earlier than six years, however, *the Company cannot give any assurances at this time that such event will occur*." (emphasis added)).

$965,637.67 for the final tranche of Series A Junior Preferred redemptions.[191] But Maginn did not distribute this money to New Media II-B members until December 2013—more than two years later.[192] That Maginn used New Media II-B's funds to purchase an extension to the Series A Junior warrants and to purchase the II-C Warrant for New Media II-C further undercuts his assertion that the funds were unavailable.[193]

Ultimately, Maginn's characterization of New Media II-B's financial status is unsupported and self-serving.[194] Maginn offered no evidence indicating that New Media II-B was financially unable to purchase or exercise (at least a significant part of) the II-C Warrant.

### b. Line of Business

The second *Broz* factor directs me to consider whether the II-C Warrant was in New Media II-B's "line of business."[195] "[A] company's line of business includes

---

[191] JX 48.

[192] *See* JX 101; JX 132; JX 140; Maginn Tr. 157, 219-20. In the past, Maginn had distributed the payments promptly. *See* JX 30 (showing that Jenzabar paid New Media II-B on January 21, 2011, and New Media II-B distributed the payment to members on March 4, 2011).

[193] Maginn Tr. 154; JX 130 at 2; JX 68. Maginn also used New Media II funds for "various Delaware fees" of New Media II-C—amounting to $1,640.14. JX 130 at 2. Maginn eventually reimbursed these expenses to New Media II. *Id.*

[194] *See Grove v. Brown*, 2013 WL 4041495, at *9 (Del. Ch. Aug. 8, 2013) (rejecting waiver defense to corporate opportunity claim because "[t]he only evidence of waiver was self-serving testimony from [the defendant]").

[195] *See Broz*, 673 A.2d at 155.

41

all activities where the company has 'fundamental knowledge, practical experience and ability to pursue' provided that the activity is 'consonant with its reasonable needs and aspirations for expansion.'"[196] This concept "has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case," and "latitude should be allowed for development and expansion."[197] "Delaware courts accordingly have 'broadly interpreted' the 'nature of the corporation's business' when 'determining whether a corporation has an interest in a line of business.'"[198]

"For purposes of an investment, the focus of this factor should be on whether the form of investment was suitable for the entity and vice versa."[199] Maginn does not dispute that the II-C Warrant was a suitable investment for New Media II-B.[200] The "business and purpose" of New Media II-B was to make "investments in

---

[196] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *16 (Del. Ch. May 13, 2022) (quoting *Guth*, 5 A.2d at 514).

[197] *Guth*, 5 A.2d at 514.

[198] *Pers. Touch*, 2019 WL 937180, at *16 (quoting *Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012)).

[199] *Metro Storage*, 275 A.3d at 853.

[200] *See* Def.'s Post-trial Br. 37-42.

securities and other interests of Jenzabar."[201] New Media II-B also previously held warrants (the Series A Junior warrants) nearly identical to the II-C Warrant.[202]

### c. Interest or Expectancy

The third *Broz* factor looks at whether New Media II-B had an "interest or expectancy" in the II-C Warrant.[203] "In order for a company to have an 'actual or expectant interest' in a corporate opportunity, 'there must be some tie between that [opportunity] and the nature of the corporate business.'"[204] This factor "implicates many of the [same] issues" as the "line of business" inquiry.[205] The court in *Broz*, for example, found that the company in that case had no interest or expectancy in a license because it was divesting its holdings and its business plan did not contemplate any new acquisitions.[206]

There is a clear "tie between" New Media II-B's business—which was to make "investments in securities and other interests of Jenzabar"—and the II-C Warrant.[207] Yet, Maginn contends that New Media II-B had no interest or

---

[201] LLC Agreement § 2.

[202] *Compare* JX 7 (Series A Junior warrants) *with* JX 89 (II-C Warrant).

[203] *See Broz*, 673 A.2d at 155.

[204] *SDF Funding*, 2022 WL 1511594, at *16 (quoting *Johnston v. Greene*, 121 A.2d 919, 924 (Del. 1956)).

[205] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 973 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

[206] *Broz*, 673 A.2d at 156.

[207] LLC Agreement § 2.

expectancy in the II-C Warrant because New Media II-B's business "effectively concluded."[208] He points out that the Series A Junior Preferred stock had been fully redeemed and the Series A Junior warrants were expiring.

New Media II-B was not, however, constructed to hold a single Jenzabar investment.[209] "The business and purpose of [New Media II-B was] to make such investments as [Maginn] determine[d], including, without limitation, investments in securities and other interests in Jenzabar."[210] So long as Jenzabar remained a going concern and the New Media entities had a lawful right to invest in Jenzabar securities, that purpose remained viable. Indeed, the investments held by New Media II-B had already morphed once as a result of the 2004 Jenzabar restructuring. It was possible for these investments to morph once again—this time from cash into the II-C Warrant.

If Maginn had determined that New Media II-B's business had been accomplished, he could have returned each member's investment and sought to

---

[208] Def.'s Post-trial Br. 37-39.

[209] Maginn argues that a contrary finding would mean that New Media II-B competed with New Media II. *Id.* at 5, 41-42. Not so. The factual circumstances surrounding the formation of New Media II-B are different from those surrounding the issuance of the II-C Warrant. At the time New Media II-B was formed, New Media II had no liquid assets and thus was not financially able to pursue the investment opportunity that was ultimately placed into New Media II-B. *See* JX 167 at 18-19.

[210] LLC Agreement § 2.

terminate New Media II-B's corporate status.[211]  He did not.  Instead, he purportedly set out to find additional Jenzabar investment opportunities for New Media II-B.  He did not attempt to cancel New Media II-B's corporate status until 2020.[212]

Finally, Maginn argues that New Media II-B lacked an expectancy in the II-C Warrant because it was not intended to issue to New Media II-B.  This position is belied by Maginn's own insistence that his actions were motivated by a desire to seek a better outcome for New Media II-B and its members.[213]  Maginn proposed and created the New Media II-C investment structure, causing the Special Committee to issue the II-C Warrant to New Media II-C instead of New Media II-B.  The Special Committee believed that the II-C Warrant would to go a "successor entity" to New Media II and New Media II-B.[214]

In sum, the record supports the conclusion that New Media II-B had an interest in, and a reasonable expectation of, an opportunity to acquire the II-C Warrant.

---

[211] *See supra* note 189 (discussing the discretion granted to Maginn by the LLC Agreement).  Maginn's discretion was also limited by Section 13 of the LLC Agreement, which provides that winding up and dissolution are only possible upon "the written determination of the Members" or "the entry of a decree of judicial dissolution."  LLC Agreement § 13.  That Maginn did not have the unilateral power to wind-up and dissolve New Media II-B further cuts against his assertion that New Media II-B's investment in Jenzabar had concluded by June 2012.

[212] JX 172.

[213] *See supra* notes 33-37 and accompanying text.

[214] JX 87.

d.    Inimical Position

The fourth *Broz* factor prohibits a fiduciary from taking an opportunity for his own if "the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."[215] "For a traditional business opportunity, this factor typically looks to whether the fiduciary will be competing in some way with the entity he serves or depriving it of an advantage."[216] "[T]he fiduciary's seizure of an opportunity [must] result[] in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."[217]

Although Maginn was a member of New Media II-B, he only held a 4.58% interest in that entity.[218] He knew that the II-C Warrant was intended to address the expiration of the Series A Junior warrants. He "borrowed" funds from New Media II-B to pay for the II-C Warrant. But despite the understanding that the II-C Warrant would be placed with a new "successor entity," it was given to New Media II-C—an entity wholly owned by Maginn and his spouse.[219] Maginn was able to personally

---

[215] *Broz*, 673 A.2d at 155.

[216] *Metro Storage*, 275 A.3d at 854.

[217] *Broz*, 673 A.2d at 157.

[218] JX 196 at 5.

[219] Maginn Tr. 190-92.

46

reap a financial benefit not equally shared by the members of New Media II-B. He deprived New Media II-B of the chance to share in the II-C Warrant.[220]

At the time Maginn obtained the II-C Warrant, he did not know the exercise price, which would later be determined by KPMG. It is clear, however, that he expected some upside.[221] Around the time the warrants issued, Maginn was "enthusiastic and optimistic about" Jenzabar,[222] had inside knowledge of Jenzabar's prospects by virtue of his officer role, already held a sizable portion of Jenzabar,[223] and was able to obtain the II-C Warrant (representing 11% of Jenzabar's fully diluted equity[224]) for just $65,000.

That Maginn placed himself in a position inimical to his corporate duties to New Media II-B is underscored by his furtive behavior. Despite his role as Managing Member of New Media II-B, he remained silent about the II-C Warrant. The II-C Solicitation provided virtually no information about the opportunity and by the time it was sent, Maginn had already exercised the II-C Warrant. In fact, as discussed above, the plaintiffs only found out about the II-C Warrant years later during discovery in this litigation.

---

[220] *See Metro Storage*, 275 A.3d at 854.

[221] *See id.*

[222] Maginn Tr. 179.

[223] *See* JX 76 (Jenzabar capitalization table as of December 30, 2011).

[224] *See id.*

All four factors of the *Broz* framework favor the plaintiffs. Considering the factors holistically,[225] I find that Maginn breached his fiduciary duty of loyalty by usurping from New Media II-B the opportunity to obtain the II-C Warrant.[226]

## D. Whether the Plaintiffs Proved Unjust Enrichment

In addition to their duty of loyalty claim, the plaintiffs sought to prove that Maginn was unjustly enriched. To prevail on their unjust enrichment claim, the plaintiffs needed to demonstrate, by a preponderance of the evidence: (1) an enrichment, (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided at law.[227] Because the plaintiffs proved that Maginn breached his duty of loyalty, they have also proven unjust enrichment.[228]

---

[225] *Broz*, 673 A.2d at 155 ("No one factor [of the *Broz* framework] is dispositive and all factors must be taken into account insofar as they are applicable.").

[226] Maginn suggests that he cannot be found to have usurped a business opportunity because the II-C Solicitation presented the opportunity to members, who declined to pursue it. *See* Def.'s Pre-trial Br. 40-41. As discussed above, the II-C Solicitation merely mentioned that "New Media Investors ha[d] formed a new New Media entity, New Media Investors IIC, LLC, to invest in another Jenzabar opportunity." JX 133 at 1. It did not mention the II-C Warrant, financial details about the warrants, or the intended benefit for New Media II and New Media II-B. *See supra* notes 128-36. The II-C Solicitation also came months after Maginn had taken the opportunity for himself.

[227] *See Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *13 (Del. Ch. Dec. 28, 2008).

[228] *See MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010) ("If MCG is able to prove Maginn breached his duty of loyalty in Count Five then it will also be successful in proving unjust enrichment in Count Six. Both claims hinge on

Maginn was enriched when he obtained the full value of the II-C Warrant he had supposedly negotiated for the members of New Media II and New Media II-B. New Media II-B was not given the opportunity to obtain the II-C Warrant and its members did not receive any of the benefits. But the fiduciary duty and unjust enrichment claims seek an identical recovery, making them redundant.[229] The plaintiffs are not entitled to further relief for their unjust enrichment claim beyond that described below.

### E.    The Appropriate Remedy

The plaintiffs must prove their damages by a preponderance of the evidence.[230] Damages must "logically and reasonably relate[] to the harm or injury for which compensation is being awarded."[231] But "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury

---

whether Maginn was disloyal to Jenzabar by the manner in which he procured the 2002 Bonus.").

[229] *See id.*; *Deputy v. Deputy*, 2020 WL 1018554, at *47 (Del. Ch. Mar. 2, 2020).

[230] *See, e.g.*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013); *Metro Storage*, 275 A.3d at 859.

[231] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006)

49

established."[232]  Rather, "once a breach of duty of loyalty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[233]

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[234]  "Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."[235]  But, "[s]peculation is an insufficient basis" upon which to award damages.[236]

### 1.  Form of Damages

This court has broad discretion to "fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."[237]  A remedy for a proven breach of the duty of loyalty may require the defendant fiduciary to

---

[232] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

[233] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011) (citation omitted).

[234] *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[235] *Pers. Touch*, 2019 WL 937180, at *18 (quoting *Red Sail Easter*, 1992 WL 251380, at *7).

[236] *Id.*

[237] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983); *see Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) (explaining that "[i]n determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief").

"disgorge all profits and equity from the usurpation."[238] "If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit."[239]

The plaintiffs seek rescissory damages measured by the total profits Maginn received from the II-C Warrant as of December 2020.[240] Maginn contends that the proper remedy is compensatory damages as of 2013, amounting to $20,825 based on the plaintiffs' proportionate interests in the II-C Warrant.[241] He asserts that this approach, rather than rescissory damages, is equitable because Maginn did not deprive the plaintiffs of property they actually owned.[242] A beneficiary can, however, "force a fiduciary to disgorge the benefits that the fiduciary received without a showing of harm to the beneficiary."[243]

---

[238] *Mobilactive Media*, 2013 WL 297950, at *23; *see also Pers. Touch*, 2019 WL 937180, at *18 ("[T]his court has awarded lost profits as a measure of damages for usurpation of ongoing business opportunities."); *Dweck*, 2012 WL 161590, at *17 (awarding the defendant's profits as damages); *Grove*, 2013 WL 4041495, at *10 (same).

[239] *Guth*, 5 A.2d at 510.

[240] Pls.' Post-trial Br. 50-57.

[241] Def.'s Post-trial Br. 53-56.

[242] *See* Def.'s Opp'n to Pls.' Mot. Lim. (Dkt. 259) ¶¶ 5-10.

[243] *Metro Storage*, 275 A.3d at 860 (citing *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991).

Compensatory damages "determined at the time of the transaction"[244] would not fully compensate the plaintiffs for their harm. "It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary."[245] To remedy Maginn's disloyal actions, damages must account for the benefit that Maginn realized by obtaining the II-C Warrant instead of providing that opportunity to New Media II-B.[246]

Maginn next argues that rescissory damages—measured as of 2020—are inappropriate because the plaintiffs delayed in prosecuting their case. Although the passage of time "plays less of a role 'for rescissory damages than with true rescission,'" "it remains "a relevant consideration when determining whether to award rescissory damages."[247] A plaintiff's delay in bringing a claim may counsel against awarding rescissory damages when such damages would (1) amount to "windfall awards" or (2) reward a plaintiff "who attempts to 'sit back and test the

---

[244] *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000).

[245] *Oberly*, 592 A.2d at 463.

[246] *See Mobilactive Media*, 2013 WL 297950, at \*23; *Oberly*, 592 A.2d at 466 (explaining that a plaintiff may "demand rescission of the transaction or, if that is impractical, the payment of rescissory damages" where the defendant has breached its duty of loyalty).

[247] *SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at \*4 (Del. Ch. Dec. 21, 2021) (quoting *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 41 (Del. Ch. Feb. 28, 2014)).

52

waters, see how the transaction plays out, and then sue[s] for rescissory damages if the deal turned out well for the other side.'"[248]

Neither situation is present here. At times, the plaintiffs have not proceeded with any semblance of alacrity in pursuing their claims.[249] But, again, they did not learn about the II-C Warrant and associated duty of loyalty claim until 2021.[250]

Rescissory damages would also not amount to a windfall in this context. The court has been reluctant to award rescissory damages when doing so could "include elements of value causally unrelated to the wrongdoing."[251] Those concerns are lessened where a fiduciary engages in self-dealing or usurps an opportunity belonging to a plaintiff entity. In such situations, the court may impose a remedy to counter the fiduciary's unjust enrichment.[252]

---

[248] *Id.* at *4; *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 699 (Del. Ch. 1996) ("The underlying policy reason is that excessive delay enables a plaintiff otherwise to 'sit back and test the waters,' opportunistically waiting to see whether the defendants achieve an increase in the value of the company above its likely appraisal value, before deciding to assert a claim for rescission, or its monetary equivalent, rescissory damages.").

[249] *See* Summ. J. Op. at *6-11.

[250] *See supra* notes 128-36; Deane Tr. 549-50; Cunningham Tr. 585; Wihbey Tr. 627-28.

[251] *Strassburger*, 752 A.2d at 580; *Oberly*, 592 A.2d at 463 (explaining that a court of equity will not countenance a fiduciary to profit from a breach of the duty of loyalty, which would amount to unjust enrichment).

[252] *See Strassburger*, 752 A.2d at 581.

53

It would be equitable in this case to assess the plaintiffs' damages at the time of trial.[253] But as a practical matter, the time at which the plaintiffs' rescissory damages are measured must be earlier due to the availability of evidence presented by the parties. That time is December 31, 2020.

### 2. Quantification of Damages

Maginn exercised the II-C Warrant for $3,055,000 and received 6,500,000 common voting Jenzabar shares and 65,000,000 common non-voting Jenzabar shares.[254] That is, each individual warrant equated to one voting shares and ten non-voting shares of Jenzabar common stock. To quantify the value of those shares, each party relied on an expert. Maginn offered the expert opinion of Sean O'Reilly, a

---

[253] *See Pers. Touch*, 2019 WL 937180, at *18-19 (awarding damages based on the defendant's profits, as measured at time of trial in 2018, for usurpation of corporate opportunity in 2015); *Orchard*, 88 A.3d at 39 ("In a case involving corporate stock, rescissory damages can be measured at the time of judgment, the time of resale, or at an intervening point when the stock had a higher value and remained in control of the disloyal fiduciary.").

The plaintiffs filed a Motion in Limine to Establish that Damages Should be Ascertained as of the Time of Trial, which Maginn opposed. *See* Pls.' Mot. Lim. (Dkt. 239); Def.'s Opp'n to Pls.' Mot. Lim. (Dkt. 259). I declined to rule on that motion in advance of trial since it asked the court to determine how damages would be calculated before the court had heard evidence in the case. To the extent that the motion in limine sought an evidentiary ruling, is it is denied. Nonetheless, I have determined that calculating damages "at the time of trial" (specifically, as of December 31, 2020) is appropriate—effectively the same relief requested in the plaintiffs' motion.

[254] Maginn purchased the II-C Warrant on June 29, 2012. JX 89; 91; *see* JX 87. A few days later on July 1, Jenzabar performed a share dividend. Each stockholder received ten new, non-voting shares. Maginn Tr. 211-13; JX 128 at 26. Thus, each individual warrant provided for in the II-C Warrant netted one share of Jenzabar voting common stock and 10 shares of Jenzabar non-voting common stock.

54

partner in the valuation services practice of CFGI, LLC.[255] The plaintiffs offered the opinion of Jason Cunningham, an investment banker and the managing partner of Eaglehill Advisors, LLC, a private credit investment firm.[256]

O'Reilly calculated that fair market value of the operating equity of Jenzabar as of December 31, 2020 to be $119,341,000 on a marketable, minority basis.[257] He reached that value based on a discounted cash flow ("DCF") analysis and a comparable companies analysis. O'Reilly opined that the fair market value of Jenzabar's voting and non-voting common stock was $0.3149 per share and $0.3086 per share, respectively, on a fully-diluted, minority, non-marketable basis as of December 31, 2020.[258] Thus, the common shares provided by each warrant are worth $3.4009,[259] and the total shares represented by the II-C Warrant (consisting of

---

[255] *See* JX 269 ("2022 O'Reilly Report") ¶ 6; *see also* JX 174 ("2021 O'Reilly Report"); JX 189 ("Rebuttal O'Reilly Report").

[256] *See* JX 176 ("Rebuttal Cunningham Report") at 2; *see also* JX 188 ("Supplemental Cunningham Report"); JX 204 ("Updated Cunningham Report"). Jason Cunningham is also serving as the attorney-in-fact for his father, William Cunningham. In reviewing Cunningham's analyses, I am mindful of any bias that might have influenced his opinions. Certain of Cunningham's positions are, however, objectively reasonable and I give them the appropriate weight in considering the parties' respective arguments on damages.

[257] 2022 O'Reilly Report ¶ 95, App. E at B.5a.

[258] *Id.* ¶ 98, app. E at B.5a.

[259] Each warrant in the II-C Warrant amounts to 10 non-voting shares and one voting share or ($0.3086 * 10 + $0.3149 * 1) = $3.4009.

6,500,000 warrants) are worth $22,105,850.[260] After accounting for the $3,055,000 exercise price and $65,000 purchase price paid by Maginn, O'Reilly's analysis indicates that the value of the benefit wrongly obtained by Maginn is $18,985,850 as of the end of 2020.[261]

Cunningham considered a comparable companies analysis in assessing the fair value of Jenzabar's shares.[262] Cunningham's overall approach was to examine a 409A valuation of Jenzabar's common stock as of June 30, 2020 performed by KPMG on October 23, 2020 (the "2020 409A Valuation").[263] He calculated the total equity value of Jenzabar to be $478,119,800 as of December 31, 2020.[264] He calculated the total equity value for Jenzabar common shares on a fully-diluted basis to be $471,470,800 as of December 31, 2020.[265] Cunningham then determined each

---

[260] Maginn calculated the average value between voting and non-voting shares to be ($0.3149 * 10 + $0.3086) ÷ 2 or $0.3118 per share. He multiplies this figure by the 71,500,000 voting and non-voting shares controlled by the II-C Warrant. Def.'s Post-trial Br. 60 n.24. This is wrong because it fails to weight the 10:1 ratio of voting to non-voting shares.

[261] *See id.* Maginn calculated this value to be $19,237,610. This is wrong for the reasons explained in *supra* note 260.

[262] Updated Cunningham Report at 1.

[263] *Id.*; Cunningham Tr. 451, 456-57; *see* JX 171 ("2020 409A Valuation"). Compared with O'Reilly's and Cunningham's analyses, the 2020 409A Valuation, performed for Internal Revenue Code 409A purposes, provided the lowest valuation. *See* JX 165 at 20 ("[E]verybody wants [a 409A analysis] to be low because they don't want to . . . declare any more income than necessary on their tax return.").

[264] Updated Cunningham Report at 1; Cunningham Tr. 453.

[265] Updated Cunningham Report at 2.

pre-split common share to be worth $13.85.[266]  Based on that figure, the shares

provided by the II-C Warrant would be worth $90,011,350.[267]  Less the $3,055,000

exercise price and $65,000 share purchase price, the plaintiffs ask that Maginn be

ordered to pay a net figure of $86,891,350, ascertained as of the end of 2020.[268]

After considering the evidence and expert reports, I find O'Reilly's DCF

analysis to be unreliable and give it no weight.  I look, instead, to the comparable

companies analysis presented by each party.  I adopt the set of comparables O'Reilly

relied upon.  But I disagree with certain of the multiples selected by O'Reilly and

Cunningham.  I also reject O'Reilly's discount for lack of marketability.  My

analysis yields a total equity value for Jenzabar of $453,223,255.  I calculate a value

per common voting share of $1.194 and per common non-voting share of $1.170 as

of December 31, 2020.

I then consider the allocation of damages between New Media II and New

Media II-B.  Ultimately, I find New Media II-B entitled to $25,451,992 in damages.

---

[266] *Id.*  One pre-split share equates to one warrant for purposes of the $13.85 value. Cunningham calculated a share of post-split Jenzabar common stock to be worth $1.2589 (captured as an average price for each 11-share grouping).  *Id.*

[267] Pls.' Post-trial Br. 51.

[268] *Id.*

### a. Discounted Cash Flow Analysis

O'Reilly calculated the fair market value of Jenzabar common shares by performing a DCF analysis. He presented this income approach to value—based on the present value of expected future economic benefits—as more reliable than his market approach. He gave 90% weight to the $117,930,000 equity value resulting from his DCF analysis and 10% weight to the $132,040,000 equity value resulting from his comparable companies analysis.[269]

That relative weighting appears arbitrary. KPMG's 2020 409A Valuation, for example, gives 75% weight to DCF and 25% to a comparable companies method.[270] O'Reilly did not explain his logic, except to say that a potential buyer would be focused on cash flow.[271] Even so, giving 90% weight to the lower value seems unwarranted.

O'Reilly's DCF relied upon Jenzabar management projections included in the 2020 409A Valuation.[272] Despite Jenzabar's consistent revenue growth and profitability since 2013, the projections forecast a significant drop in revenue for

---

[269] 2022 O'Reilly Report ¶ 95, app. E at B.5a.

[270] 2020 409A Valuation sched. 1.0.

[271] 2022 O'Reilly Report ¶ 95.

[272] *Id.* ¶¶ 81-82, app. E at B.3a.

2021 and 2022.[273] Revenue was projected to drop by 18.2% from 2020 to 2021.[274] Based on those projections, O'Reilly's DCF assumed an initial revenue decline in 2021, followed by 5.0% annual growth from 2022 to 2025.[275] This initial drop in 2021 propagated through and stepped-down all future years' revenue in O'Reilly's DCF model.[276]

"An informative DCF valuation requires reliable projections."[277] The projections relied upon by O'Reilly, however, are uncertain. They are an uncontextualized forecast from a report within a report. I do not know how Jenzabar management prepared the projections KPMG used for the 2020 409A Valuation.[278]

---

[273] *See* Cunningham Tr. 457-58, 478-79, 512-14; *see also* 2021 O'Reilly Report app. E at 1b (2007-2009 revenue); 2022 O'Reilly Report app. E at A.1b (2010-2013 revenue), B.1b. (2017-2020 revenue).

[274] 2022 O'Reilly Report ¶ 82. 2020 revenue was $102,048,000. *Id.* app. E at B.1c. Projected 2021 revenue was $83,430,000 and projected 2022 revenue was $87,601,000. *Id.* app. E at B.3a.

[275] *Id.* ¶ 82, app. E at B.3a.

[276] The model started from an inexplicable projected 2021 base of $83,430,000 (instead of 105% of 2020, which would be $107,150,400). *See* Updated Cunningham Report at 4.

[277] *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *34 (Del. Ch. Aug. 19, 2022); *see In re Appraisal of SWS Grp., Inc.*, 2017 WL 2334852, at *11 (Del. Ch. May 30, 2017) (explaining that cash flow projections are "'the most important input' in performing a DCF" and, without reliable projections, 'a DCF analysis is simply a guess'" (quoting *Delaware Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006))). "With reliable inputs, a DCF valuation may be considered an educated guess." *SWS Grp.*, 2017 WL 2334852, at *11 n.180.

[278] Indeed, Maginn derided Cunningham for relying on KPMG's 2020 409A Valuation. Def.'s Post-trial Br. 60.

The record provides no information about whether the projections were prepared in the ordinary course or for some specific purpose (such as the 409A valuation). More critically, I lack any credible explanation for why Jenzabar management predicted that its business would drop off precipitously in 2021 after years of steady growth.

O'Reilly speculated, without basis, that the drop was "COVID-related."[279] Perhaps. But it seems unlikely that Jenzabar in early 2020 had the foresight to know how COVID would affect its business in the years ahead. In fact, as Cunningham credibly testified, the "Ed Tech" industry in which Jenzabar operates grew post-COVID.[280] Jenzabar's actual financial results for 2020 are consistent with that growth.[281] For example, Jenzabar's 2020 revenue increased by $1.628 million relative to 2019, exceeding management's forecast.[282]

With no basis to accept the revenue projections as reliable (and reasons to question their dependability), I give no weight to O'Reilly's DCF analysis.

---

[279] O'Reilly Tr. 375-76.

[280] Cunningham Tr. 457-58; *see also* Updated Cunningham Report at 4-5 ("There is no explanation for this massive drop . . . . The only reference is that this information had been provided by Management. There has been no industry-wide recession, and Jenzabar's contracts are very sticky. In fact Ed Tech growth has continued through 2021.").

[281] *See* Cunningham Tr. 457-58; Updated Cunningham Report app. C.

[282] 2019 revenue was $100,420,00. Management projected 2020 revenue to be $100,518,000; actual 2020 revenue was $102,048,000. 2022 O'Reilly Report app. E at B.1b; 2020 409A Valuation sched. 3.0.

### b. Guideline Public Company Method

Both O'Reilly and Cunningham analyzed the value of Jenzabar using a guideline public company, or comparable company, analysis. "This is a standard valuation technique whereby financial ratios of public companies similar to the one being valued are applied to a subject company."[283] The methodology takes a market approach, indicating value based upon multiples calculated using the market value of minority interests in publicly traded comparable companies.[284]

This methodology is appropriate only where the guideline companies selected are truly comparable.[285] The burden of establishing that the companies used in the analysis are sufficiently comparable rests upon the party advancing the comparables method.[286] The selected companies need not be a perfect match but, to be reliable, the methodology must employ "a good sample of actual comparables."[287]

---

[283] *BGC Partners*, 2022 WL 3581641, at *32; *see Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *4 (Del. Ch. June 15, 1995) (recognizing the reliability of comparable company analyses).

[284] 2022 O'Reilly Report ¶ 49.

[285] *See, e.g.*, *Laidler v. Hesco Bastion Env't, Inc.*, 2014 WL 1877536, at *8 (Del. Ch. May 12, 2014) (rejecting a comparable companies analysis where the proponent failed to demonstrate the companies were "truly comparable"); *see also BGC Partners*, 2022 WL 3581641, at *32.

[286] *See ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 916 (Del. Ch. 1999) ("The burden of proof on the question whether the comparables are truly comparable lies with the party making that assertion.").

[287] *In re Orchard Enters., Inc. S'holder Litig.*, 2012 WL 2923305, at *10 (Del. Ch. July 18, 2012).

O'Reilly selected eight guideline companies that are engaged in the same or a similar line of business as and have reasonably similar investment characteristics to Jenzabar. After searching for and identifying the appropriate comparables, he selected: American Software, Inc.; Blackbaud, Inc.; Manhattan Associates, Inc.; 2U, Inc.; Tribal Group plc; Stride, Inc. (formerly known as K12 Inc.); Grand Canyon Education, Inc.; and Zovio, Inc.[288] These companies were all in the software business and four (2U, Tribal, Zovio, and Grand Canyon) operated in the education sector.[289] Like Jenzabar, the selected comparables were mature companies and had similar revenues and EBITDA.[290]

With the exception of two, the guideline public companies that O'Reilly selected overlap with those chosen by KPMG for its 2020 409A Valuation.[291] Cunningham largely agreed that O'Reilly's selected comparables were appropriate.[292] I adopt this pool of eight comparables as the starting point for my analysis.

[288] *See* 2022 O'Reilly Report ¶ 50, app. E at A.4a, B.4a; O'Reilly Tr. 334-35.

[289] 2022 O'Reilly Report app. E at B.4a.

[290] *Id.* app. E at B.4b, B.4c.

[291] *Id.* ¶ 91. The two companies not included in the 2020 409A Valuation are Grand Canyon and Zovio. *See* 2020 409A Valuation at 4.

[292] Cunningham Tr. 443. Cunningham testified that three of the guideline companies O'Reilly selected—Zovio, Tribal, and Grand Canyon—are not sufficiently comparable to Jenzabar. *See id.* at 446 (testifying that "Zovio is a distressed company" and Tribal is not an appropriate comparable because it is "a European company, trades on a different market"), 447 (asserting that Grand Canyon is much larger than Jenzabar). That criticism

Both Cunningham and O'Reilly used revenue (rather than EBITDA) multiples in their analyses.[293]  Their respective approaches are reflected as follows:[294]

**Guideline Revenue Multiples**

| | LTM | NFY | | NFY + 1 |
|---|---|---|---|---|
| | MVIC / Revenue | TEV / Revenue | MVIC / Revenue | MVIC / Revenue |
| **High** | 11.28 | 9.7 | 11.03 | 9.90 |
| **3rd Quartile** | 5.00 | 3.53 | 4.84 | 4.57 |
| **Average** | 4.20 | 3.65 | 3.97 | 4.14 |
| **Median** | 4.01 | 3.15 | 3.59 | 3.68 |
| **1st Quartile** | 2.23 | 1.8 | 2.06 | 2.72 |
| **Low** | 0.39 | 0.9 | 0.52 | 0.82 |
| **O'Reilly Selected** | 1.31 | | 1.29 | 1.77 |
| **Cunningham Selected** | | 4.00 | | |

is not contained in his expert report, and I lack evidence to substantiate it.  O'Reilly, on the other hand, applied a thoughtful methodology to support the selection of each comparable. *See* O'Reilly Tr. 333-35, 364-365; 2022 O'Reilly Report ¶¶ 91-92, app. E at B.4a, B.4b, B.4c.  Though I recognize the logic behind Cunningham's arguments, I decline to exclude Zovio, Tribal, and Grand Canyon from the comparables analysis.

[293] O'Reilly Tr. 370; Cunningham Tr. 427-31.

[294] Data in this chart is derived from: 2022 O'Reilly Report app. E at B.4c, B.4d; 2020 409A Valuation at 4, sched. 6.0; Updated Cunningham Report at 1.

LTM stands for last twelve months (the fiscal year ending December 31, 2020).  NFY stands for next fiscal year (the fiscal year ending December 31, 2021).  NFY + 1 stands for the fiscal year subsequent to the next fiscal year (the fiscal year ending December 31, 2022).  MVIC is the market value of invested capital, which is the sum of the market value of equity (i.e., market capitalization or the price per share multiplied by the number of outstanding shares) and debt. *See* Robert W. Holthausen & Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice* 261 (2014).  TEV is total enterprise value, which is equal to total invested capital minus cash and cash equivalents. *Id.* at 559-60.

According to Cunningham, the education technology sector has migrated to using a TEV/revenue multiple rather than a TEV/EBIDTA multiple.[295] Cunningham selected a NFY TEV/revenue multiple of 4x.[296] He bases that assessment on the 2020 409A Valuation's selection of market multiples.[297] The average of these multiples was 3.65x.[298]

O'Reilly selected three MVIC/revenue multiples: LTM, NFY, and NFY + 1. He selected one of each type by averaging the 1st quartile and lowest value of the guideline company multiples.[299] O'Reilly's guideline company analysis weighted

---

[295] Updated Cunningham Report at 1; Cunningham Tr. 505-06. Cunningham has vacillated between using EBITDA and revenue multiples. In his first report, Cunningham used an EBITDA multiple, explaining that in his "professional experience, actual buyers and sellers in this market space . . . valued software educational companies almost exclusively using a market multiple of the company's EBITDA, and to a lesser extent sales multiples." Rebuttal Cunningham Report at 3. But less than a year later, Cunningham explained that "a fair valuation methodology should place a greater emphasis on Revenue (called Sales in the industry), because that is the preferred methodology in this software market now." Supplemental Cunningham Report at 1.

[296] Cunningham states he uses a "4x forward Revenue" multiple. Supplemental Cunningham Report at 4; Updated Cunningham Report at 2; Cunningham Tr. 474 (I "appl[ied] a 4 times forward sales multiple."). But for unexplained reasons, he applied this multiple to Jenzabar's 2020 revenue rather than Jenzabar's 2021 revenue. Updated Cunningham Report at 1; Cunningham Tr. 475 ("I took Jenzabar's 2020 revenue, [and] multipl[ied] it by 4.").

[297] *Id.* at 3.

[298] 2020 409A Valuation at 4.

[299] 2022 O'Reilly Report ¶¶ 92-94; O'Reilly Tr. 364-72, 386-87.

the total invested capital values indicated by his application of LTM, NFY, and NFY + 1 MVIC/revenue multiples—attributing 33.33% to each.[300]

I do not adopt either expert's approach wholesale.

First, I do not find Cunningham's analysis reliable, especially given his inconsistent approach to backward-looking and forward-looking multiples and his vacillation over EBITDA versus revenue multiples.[301] He did not calculate his own multiples, but rather critiqued approaches taken in the 2020 409A Valuation.[302] He provides no data to support his choice of a 4x multiple, other than analogizing Jenzabar to American Software, which has similar revenue and EBITDA margins and trades at a 3.3x revenue multiple.[303] His opinion that Jenzabar would trade at a premium to American Software because Jenzabar's capital expense is lower than American Software as a percentage of sales is unsupported.[304]

As to O'Reilly's approach, I conclude that it is overly pessimistic. The same problems with Jenzabar's projections that taint his DCF render his valuation

---

[300] 2022 O'Reilly Report app. E at B.4d.

[301] *See supra* notes 295 & 296. The multiples from the 2020 409A Valuation he purports to rely upon are forward-looking TEV/revenue multiples—the dependability of which are questionable given their reliance on the Jenzabar forecasts discussed above.

[302] *See Hodas v. Spectrum Tech., Inc.*, 1992 WL 364682, at *3-4 (Del. Ch. 1992) (rejecting as "unpersuasive" a valuation that consisted solely of criticisms of another valuation).

[303] Cunningham Tr. 507; Updated Cunningham Report at 3.

[304] Updated Cunningham Report at 3.

approaches applying NFY and NFY + 1 multiples unhelpful.[305] Thus, I focus my analysis on the LTM MVIC/revenue multiples, which are necessarily backward-looking and supported by Jenzabar's actual results.[306] I likewise disregard O'Reilly's decision to select a MVIC/revenue multiple towards the bottom of the range. O'Reilly took that approach because "Jenzabar was forecast to have a . . . fairly significant drop in revenue and to be smaller than all the guideline companies."[307]

I conclude that it is reasonable to select the median LTM MVIC/revenue multiple of 4.01x.

ii.      *Total Equity Value*

Applying a multiple of 4.01x to the Company's actual FYE 2020 revenue yields total invested capital of $409,212,480.[308] Consistent with O'Reilly's analysis,

---

[305] Specifically, O'Reilly used the bearish revenue 2021 and 2022 forecasts of $83.430 million and $87.601 million. 2022 O'Reilly Report app. E at B.4d.

[306] Cunningham did not provide a LTM TEV/revenue multiple.

[307] O'Reilly Tr. 368. In other words, O'Reilly's approach of selecting a multiple towards the bottom of the guideline range was based on the negative outlook reflected in Jenzabar's projections. Again, I do not find those forecasts reliable.

[308] FYE stands for fiscal year ending (i.e., FYE 2020 means the fiscal year ending December 31, 2020). Jenzabar's actual revenue for FYE 2020 was $102,048,000. *See* 2022 O'Reilly Report app. E at B.1b; Updated Cunningham Report at 1.

I add the value of certain Jenzabar investments in other businesses to that total invested capital and subtract debt to determine the equity value.[309]

Both O'Reilly and Cunningham agreed on the value of Jenzabar's marketable securities investments.[310] Each applied a liquidation discount because Jenzabar would be unable to sell large blocks of the investments all at once.[311] I find either approach to the liquidation discount reliable and take the average of the two.[312]

---

[309] O'Reilly Tr. 348-50. Cunningham added cash but he started with total enterprise value. Updated Cunningham Report at 1; *see supra* note 294.

[310] That figure is $48,992,000. *See* 2022 O'Reilly Report app. E at B.8; Updated Cunningham Report at 1.

[311] 2022 O'Reilly Report ¶ 96; O'Reilly Tr. 348-50; Updated Cunningham Report at 1.

[312] Jenzabar held a large block of securities in Tribal and a smaller block of securities in Quad Partners V LP. 2020 409A Valuation at 8. O'Reilly calculated a liquidation discounted value of $42,806,750 for the large block of Tribal securities. 2022 O'Reilly Report ¶ 96, app. E at B.5a, B.8. He did not apply the liquidation discount to the smaller block of Quad Partners securities, which amounted to $1,475,000. *Id.* The total value of marketable securities, as calculated by O'Reilly, was $44,281,750. Cunningham did not distinguish between the Tribal and Quad Partners securities. Updated Cunningham Report at 1. He calculated a total discounted value of $44,029,800. *Id.*

I use the average of $44,281,750 and $44,029,800, which is $44,155,775.

My calculated total invested capital value, less Jenzabar's total interest-bearing debt,[313] plus the total marketable securities adjusted for a liquidation discount, yields a total equity value of $453,223,255. That calculation is below:

**Calculation of Total Equity Value**

| | |
|---|---|
| FYE 2020 Revenue | $102,048,000 |
| *Guideline Multiple* | |
|     MVIC / Revenue Multiple | 4.01 |
| **Total Invested Capital** | $409,212,480 |
| *Less* | |
|     Debt | $145,000 |
| *Plus* | |
|     Marketable Securities | $48,922,000 |
|     Adjusted for Liquidation Discount | $44,155,775 |
| **Total Equity Value** | $453,223,255 |

### iii. *Discount for Lack of Marketability*

O'Reilly applied a 25% discount for lack of marketability.[314] He opined that doing so is appropriate since Jenzabar common shares lack a ready market for purchase and there is no liquidity event on the immediate horizon.[315] Cunningham

---

[313] O'Reilly estimated Jenzabar's total interest-bearing debt to be $145,000. 2022 O'Reilly Report ¶¶ 90, 94, app. E at B.1c, B.4d. Cunningham used a value of zero for debt. Updated Cunningham Report at 1. This difference is minimal.

[314] 2022 O'Reilly Report ¶¶ 9, 59, 98, app. E at B.6, B.7; O'Reilly Tr. 313-18.

[315] 2022 O'Reilly Report ¶ 9.

disagreed, arguing that "a significant stake" in a company like Jenzabar would have provided various opportunities for value realization.[316]

I decline to apply a lack of marketability discount for two reasons.

First, O'Reilly applied this discount to Jenzabar's common equity value. Such marketability discounts are disfavored where (as in the appraisal context) the court's objective is to value the entity itself, "as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder."[317] "Even if taken 'at the corporate level' (in circumstances in which the effect on the fair value of the shares is the same as a 'shareholder level' discount) such a discount is, nevertheless, based on the trading characteristics of the shares themselves, not any factor intrinsic to the corporation or its assets."[318] That logic applies here.

Second, to apply an entity-wide marketability discount on these facts would defeat the plaintiff-friendly approach to damages I am charged to take in fashioning a remedy for a breach of a duty of loyalty.[319]

---

[316] Updated Cunningham Report at 5.

[317] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989); *see also Prescott Grp. Small Cap, L.P. v. Coleman Co.*, 2004 WL 2059515, at *32 (Del. Ch. Sept. 8, 2004) (noting that "marketability discounts at the shareholder level are impermissible under Delaware appraisal law"); *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *11 (Del. Ch. Apr. 30, 2012).

[318] *Borruso v. Commc'ns Telesystems Int'l*, 753 A.2d 451, 460 (Del. Ch. 1999).

[319] *See supra* notes 234-39 and accompanying text.

### c. Allocation of Equity

I next consider the allocation of equity to common stockholders. Jenzabar had Series B Junior Preferred stock and Subordinated Preferred stock, both of which have liquidation preferences. Cunningham deferred to the 2020 409A Report's analysis—which used an option pricing model—to calculate these liquidation preferences.[320] O'Reilly performed his own independent analysis, also using the option pricing model.[321]

These two calculations yield almost identical values.[322] I find that both are reliable and take the average, arriving at a total liquidation preference of $6,599,350 for Series B Junior Preferred stock and Subordinated Preferred stock. I consider the number of outstanding common shares to be 374,050,600 for purposes of my analysis.[323]

---

[320] Updated Cunningham Report at 2 (citing 2020 409A Valuation sched. 16.0).

[321] 2022 O'Reilly Report ¶ 97, app. E at B.9a.

[322] O'Reilly allocated $2,056,249 to Series B Junior Preferred stock and $4,493,450 to Subordinated Preferred stock. *Id.* ¶ 97, app. E at B.5a, B.9a. Cunningham allocated $2,085,000 and $4,564,000, respectively. Updated Cunningham Report at 2; 2020 409A Valuation at 11, sched. 14.0. The average aggregate liquidation preference is $6,599,349.50.

[323] According to the 2020 409A Valuation, Jenzabar had 34,004,600 voting common shares and 340,046,000 non-voting common shares (a total of 374,050,600 common shares). *See* 2020 409A Valuation sched. 13.0. Jenzabar also had 1,500 Series B Junior Preferred shares and 456,355 Subordinated Preferred shares; both preferred shares were non-convertible and non-participating. *Id.* That is the figure I adopt. *See* 2020 409A Valuation scheds. 13.0, 16.0, 17.0.

The following reflects my calculation of the value of Jenzabar common stock, adopting the 2% discount for non-voting common stock O'Reilly calculated:[324]

**Calculation of Common Stock Value**

| | |
|---|---|
| Total Equity Value | $453,223,255 |
| *Less* | |
|     Liquidation Preferences of Preferred Stock | $6,599,350 |
| Common Equity Value | $446,623,906 |
| Common Shares Outstanding | 374,050,600 |
| **Value per Voting Share** | $1.194 |
| **Value per Non-Voting Share** | $1.170 |
| **Value Per "Warrant"** (10 Voting Shares and 1 Non-Voting Share) | $12.895 |

d.    Allocation Between New Media II and New Media II-B

As shown above, I find that each common share (equating to 10 non-voting and 1 voting share) provided by the II-C Warrant to have a value of $12.895 as of December 31, 2020.  Thus, the total shares provided to Maginn by the II-C Warrant (6,500,000 pre-split) were worth $83,817,500 as of December 31, 2020.  Less the

---

O'Reilly used 374,061,600 for the number of common shares outstanding.  2022 O'Reilly Report app. E at B.5a.  He does not explain how he arrives at this figure. Cunningham used 374,508,455 (sum of the number of common voting and non-voting, Series B Junior Preferred, and Subordinated Preferred shares) because he assumed (wrongly) the preferred shares would participate with common shares.  Updated Cunningham Report at 2.

[324] O'Reilly Tr. 318; 2022 O'Reilly Report ¶ 98.  Cunningham adopted a 2.25% discount rate.  Updated Cunningham Report at 2.  But the 2020 409A Valuation he cites for this appears to use a 2% discount rate.  2020 409A Valuation sched. 17.0, Workpaper 2.0.

$3,055,000 exercise price and $65,000 to purchase the warrants, Maginn profited by $80,697,500.

New Media II-B is not entitled to that full amount as damages. New Media II also had an expectation in a substantial portion of the II-C Warrant. New Media II was, however, dissolved. None of the plaintiffs were members of New Media II and they cannot act on that default entity's behalf. New Media II-B would obtain a windfall if it could recover for the total value of a business opportunity that was also intended for New Media II.

I find that it is appropriate to allocate damages in proportion to the Series A Junior warrants held by the respective entities since the II-C Warrant was intended to be a follow-on investment to these Series A Junior warrants.[325] New Media II-B held 31.54% of these Series A Junior warrants.[326] Applying that ratio to the portion of the II-C Warrant opportunity New Media II-B could reasonably have expected to receive had Maginn not usurped it, I find New Media II-B entitled to $25,451,992 in damages.

---

[325] *See supra* notes 33-42 and accompanying text.

[326] New Media II-B held 1,129,275 Series A Junior warrants. JX 7. New Media II held 2,451,455 Series A Junior warrants. JX 167 at 18.

## F. Pro Rata Distribution to New Media II-B Members

The damages awarded in this decision are for a derivative business opportunity claim. The individual members are not entitled to a personal recovery. Given the unique circumstances of this case and the nature of New Media II-B, I go on to consider whether a pro rata recovery at the member level is appropriate.

"[S]ubstantial authority supports a court's ability to grant a pro rata recovery on a derivative claim. Such a recovery is the exception, not the rule, but it is possible."[327] There is a "certain elegance in this approach" where "it would prevent wrongdoers who misappropriate[] corporate property from enjoying any aspect of the corporation's recovery."[328] An investor-level recovery on an entity-level claim may be appropriate where "an entity-level recovery would benefit 'guilty' stockholders, but an investor-level recovery could be more narrowly tailored to benefit only 'innocent' stockholders" or where "the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a pro rata recovery is more efficient."[329]

---

[327] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 75 (Del. Ch. 2015), *rev'd on other grounds sub nom. El Paso Pipeline GP Co., LLC v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016); *see also In re Happy Child World, Inc.*, 2020 WL 5793156, at *2 (Del. Ch. Sept. 29, 2020) ("As a court of equity, this Court . . . would be within its authority to fashion [a direct recovery for a derivative claim] if it did so with care.").

[328] *Happy Child*, 2020 WL 5793156, at *2.

[329] *El Paso*, 132 A.2d at 123-25.

These scenarios are salient to the present matter. Maginn may remain a member of New Media II-B.[330] Even if he is not, New Media II-B's nature as a vehicle to raise funds to invest in Jenzabar calls for a pro rata recovery. If the opportunity of the II-C Warrant had been given, in part, to New Media II-B, then its members would have ultimately benefitted in the form of distributions. Ordering the full award to be paid to New Media II-B—given the questions surrounding its member roster and current managers—could lead to further deceit and inequity. Accordingly, damages will be distributed pro rata to the members of New Media II-B (excluding Maginn).

Although the plaintiffs recognize that there may well be members of New Media II-B in addition to the plaintiffs, their identities are presently unknown. The limited evidence on this issue is unilluminating.[331] It indicates that there may be

---

[330] The plaintiffs sought a declaration that Maginn is no longer a member of New Media II-B. The written discovery responses by Maginn that the plaintiffs cite on this basis provide that Maginn "received" a final check but not that he cashed or deposited it. *See* JX 173 at 14. It is not clear to me whether Maginn remains a member of New Media II-B.

[331] Maginn has continued to argue that Count II is barred by Court of Chancery Rule 19 because the plaintiffs have failed to join necessary parties. *See* Def.'s Post-trial Br. 52 (renewing "his Rule 19 and 23.1 arguments for why Count [II] is barred"). To the extent he has not briefed those arguments post-trial, they are waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). It is not clear what "Rule 23.1 arguments" he refers to that continue to apply. Regarding Rule 19, as at the summary judgment stage, he failed to show that there exist persons necessary or indispensable to the action. *See* Summ. J. Op. at \*12-13.

somewhere between two and 85 remaining members of New Media II-B.[332]

Here, I pause to consider the plaintiffs' request for declaratory relief. That New Media II-B members beyond the three plaintiffs may remain is, alone, grounds to reject the plaintiffs' request for a declaratory judgment that they are the sole remaining members of New Media II-B and acted to remove Maginn as Managing Member of New Media II-B and to elect themselves as managers.[333] Nor can I find that these actions were valid.[334]

A number of practical problems result. The parties appear not to know the identities of New Media II-B's members.[335] They have not addressed the method by which members of New Media II-B will be located. They have not considered who (beyond this court) will be responsible for overseeing the distribution of damages to the members that are identified. If Maginn remains the Managing Member of New Media II-B, as he claims, it would hardly be appropriate for him to handle this task.

---

[332] *See id.* at *13 (discussing evidence offered by Maginn); *see also* Deane Tr. 565-67.

[333] *See* Pls.' Post-trial Br. 56; Am. Compl. ¶¶ 168-83.

[334] *See* JX 181.

[335] They also disagree on which members would be entitled to recover. The plaintiffs say that the members who intentionally relinquished their membership in New Media II-B should be considered "out of the division of the pie," while those who were never contacted by Maginn, did not receive the II-C Solicitation, did not sign a release, or did not terminate their membership would be entitled to recovery. Post-trial Tr. 10. The defendants, on the other hand, argue that the plaintiffs alone should be awarded damages totaling 0.75% of the total remedy, in proportion to their interests in New Media II-B. Def.'s Post-trial Br. 60.

The plaintiffs previously moved for the appointment of a receiver to seek out the members of New Media II-B and assess whether such members have credible claims to recover in this litigation.[336] In the Summary Judgment Opinion, I explained that because the Delaware Limited Liability Company Act lacks a provision on appointing receivers, the court would need to rely on its general equitable powers to grant that relief.[337] Appointing a receiver would have been inappropriate then. After trial, however, the appointment of a receiver (or monitor) is an equitable means to prevent further harm and carry out the court's judgment.[338]

These issues must be resolved to provide a fair remedy in the unique circumstances of this case. Accordingly, the parties shall brief a proposed course of action for providing a pro rata recovery to New Media II-B's members (excluding Maginn). Their submissions shall address whether the appointment of a receiver would be appropriate to assist with the distribution process. A further decision of this court will address the parties' submissions and next steps.

---

[336] *See* Dkt. 174.

[337] Summ. J. Op. at *13.

[338] *See Drob v. Nat'l Mem'l Park*, 41 A.2d 589 (Del. Ch. 1945); *see also In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 3655257, at *7-8 (Del. Ch. Aug. 1, 2018) (explaining that "[c]ourts of equity have tools at their disposal to mitigate the problem of supervising a complex remedy" and appointing a monitor to supervise the parties' compliance with a decree of specific performance), *rev'd on other grounds*, 202 A.3d 482 (Del. 2019).

## III.   CONCLUSION

Maginn is liable for breaching his duty of loyalty by usurping an opportunity from New Media II-B.  Judgment will be entered against him on that basis.  The quantum of New Media II-B's damages is $25,451,992, which will be paid pro rata to the members of New Media II-B (other than Maginn).  Further proceedings are necessary to determine the method by which such members will be identified and their recovery will be distributed.  The parties shall confer on and submit a proposed schedule for filing the submissions requested above.